Thomas E. Wheeler (CA Bar #304191)
Environmental Protection Information Center
145 G Street #A
Arcata, CA 95521
Tel: (707) 822-7711
tom@wildcalifornia.org

Sangye Ince-Johannsen, *pro hac vice*
Western Environmental Law Center
120 Shelton McMurphey Blvd, Suite 340
Eugene, Oregon 97401
Tel: (541) 778-6626
sangyeij@westernlaw.org

Peter M. K. Frost, *pro hac vice*
Western Environmental Law Center
120 Shelton McMurphey Blvd, Suite 340
Eugene, Oregon 97401
Tel: (541) 359-3238
frost@westernlaw.org

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ENVIRONMENTAL PROTECTION INFORMATION CENTER,<br><br>    Plaintiff,<br><br>    v.<br><br>U.S. FISH AND WILDLIFE SERVICE,<br><br>    Defendant,<br><br>    and<br><br>SIERRA PACIFIC INDUSTRIES,<br><br>    Defendant-Intervenor. | No.  2:23-cv-2611-TLN-CSK<br><br>**PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**<br><br><br><br>Date: TBD<br>Time: TBD<br>Courtroom: 25<br>Hon. Magistrate Judge Chi Soo Kim |

1

Table of Contents

2

Table of Authorities ........................................................................................................... iii

3

Glossary of Acronyms ...................................................................................................... viii

4

Map of Sierra Pacific Industries' Habitat Conservation Plan Area .................................ix

5

Notice of Motion................................................................................................................1

6

Introduction......................................................................................................................1

7

Points and Authorities in Support of Motion...................................................................1

8

Jurisdiction.......................................................................................................................1

9

Legal Framework .............................................................................................................2

10

A. Endangered Species Act ..........................................................................................2

11

    1. Prohibited Take under the ESA. ..........................................................................2

12

    2. Incidental Take Permits. ......................................................................................3

13

    3. "Jeopardy" and Consultation. ..............................................................................3

14

    4. The "Best Scientific and Commercial Data Available" Standard. ...................4

15

B. National Environmental Policy Act..........................................................................4

16

Factual Background. .........................................................................................................5

17

A. Spotted Owls ….......................................................................................................5

18

    1. The Northern Spotted Owl...................................................................................6

19

    2. The California Spotted Owl. .................................................................................7

20

B. Spotted Owl Habitat. ................................................................................................7

21

C. Threats to Spotted Owls...........................................................................................9

22

    1. Habitat Loss Due to Logging...............................................................................9

23

    2. Climate Change. ...................................................................................................9

24

    3. Habitat Loss Due to Fire....................................................................................11

25

    4. Barred Owls. ......................................................................................................11

26

D. Sierra Pacific...........................................................................................................12

27

E. Habitat Conservation Plan. .....................................................................................13

28

    1. Covered Activities. ............................................................................................13

2.   Habitat Forms, Hexagon Analysis, and Accounting for Take.....................13

3.   Conservation Measures..............................................................15

a.   Conservation Measure 1. ....................................................15

b.   Conservation Measure 2. ....................................................15

c.   Conservation Measure 3. ....................................................16

d.   Conservation Measure 5. ....................................................17

F.   Biological Opinion and Incidental Take Statement...........................17

G.   Environmental Impact Statement...................................................17

Standard of Review......................................................................................18

Argument. ..................................................................................................19

A.   The HCP Fails to Sufficiently Minimize and Mitigate Impacts of Take...........................19

1.   Measure 1 Relies on Habitat Thresholds and Definitions Inconsistent with the Best Available Science. ....................................................................19

2.   Measure 2 Relies on Spotted Owl Surveys That Yield False Negative Results..........20

3.   Measure 3 Fails to Minimize and Mitigate Take During Salvage Logging. ...............21

B.   The BiOp Unlawfully Relies on Conservation Measures to Reach No Jeopardy. ...........23

C.   The BiOp Fails to Evaluate Climate Change in its Jeopardy Analysis. ...........................24

D.   FWS Adopted an Unlawful Definition of Take...................................................28

1.   The Hexagon Tool is Unlawful as a Basis to Determine Incidental Take.................28

2.   Surveys to Determine Spotted Owl Occupancy are Unlawfully Uncertain.................30

E.   The EIS is Unlawful Because it Contains an Improper No Action Alternative. ...............31

F.   The Court Should Vacate FWS's Unlawful Actions. .......................................35

Conclusion. ..................................................................................................35

Table of Authorities

*Alaska v. Lubchenco*,
   723 F.3d 1043 (9th Cir. 2013) ............................................................................3

*Alliance for the Wild Rockies v. Petrick*,
   68 F.4th 475 (9th Cir. 2023) ............................................................................30

*Anaheim Mem'l Hosp. v. Shalala*,
   130 F.3d 845 (9th Cir. 1997) ............................................................................19

*Ariz. Cattle Growers' Ass'n v. FWS*,
   273 F.3d 1229 (9th Cir. 2001) ....................................................................4, 19

*Bennett v. Spear*,
   520 U.S. 154 (1997) ..........................................................................................31

*Brower v. Evans*,
   257 F.3d 1058 (9th Cir. 2001) ............................................................................4

*Ctr. for Biological Diversity v. Bernhardt*,
   982 F.3d 723 (9th Cir. 2020) ............................................................................23

*Ctr. for Biological Diversity v. Salazar*,
   695 F.3d 893 (9th Cir. 2012) ............................................................................28

*Ctr. for Biological Diversity v. U.S. Bureau of Land Mgmt.*,
   422 F. Supp. 2d 1115 (N.D. Cal. 2006) ....................................................33, 35

*Chase Bank USA, N.A. v. McCoy*,
   562 U.S. 195 (2011) ............................................................................................5

*Citizens to Pres. Overton Park, Inc. v. Volpe*,
   401 U.S. 402 (1971) ..........................................................................................18

*Friends of Yosemite Valley v. Kempthorne*,
   520 F.3d 1024 (9th Cir. 2008) ......................................................................5, 31

*Great Basin Res. Watch v. U.S. Bureau of Land Mgmt.*,
   844 F.3d 1095 (9th Cir. 2016) ..........................................................................31

*Hammond v. Norton*,
   370 F. Supp. 2d 226 (D.D.C. 2005) ..................................................................31

*Intertribal Sinkyone Wilderness Council v. Nat'l Marine Fisheries Serv.*,
   970 F. Supp. 2d 988 (N.D. Cal. 2013) ................................................................4

*Karuk Tribe v. U.S. Forest Serv.*,
   681 F.3d 1006 (9th Cir. 2012) ..........................................................................18

*Klamath-Siskiyou Wildlands Ctr. v. Nat'l Oceanic and Atmospheric Admin.*,
   99 F. Supp. 3d 1033 (N.D. Cal. 2015)..........................................................22–23

*Lands Council v. McNair*,
   537 F.3d 981 (9th Cir. 2008) ............................................................................18

*Lands Council v. Powell,*
    395 F.3d 1019 (9th Cir. 2005) .................................................................5

*Nat'l Wildlife Fed'n. v. Burlington N. R.R.,*
    23 F.3d 1508 (9th Cir. 1994) ..................................................................3

*Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.,*
    524 F.3d 917 (9th Cir. 2008).  ...............................................................3

*Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.,*
    184 F. Supp. 3d 861 (D. Or. 2016) ..............................................24, 27, 28

*Native Ecosystems Council v. Dombeck,*
    304 F.3d 886 (9th Cir. 2002) ................................................................18

*Native Fish Society v. Nat'l Marine Fisheries Serv.,*
    992 F. Supp. 2d 1095 (D. Or. 2014) .......................................................24

*Nat. Res. Def. Council v. Kempthorne,*
    506 F. Supp. 2d 322 (E.D. Cal. 2007)  ..............................................24, 25

*Nat. Res. Def. Council v. U.S. Forest Serv.,*
    421 F.3d 797 (9th Cir. 2005) ................................................................34

*Nw. Ecosystem All. v. U.S. Fish & Wildlife Serv.,*
    475 F.3d 1136 (9th Cir. 2007) ..............................................................28

*Or. Nat. Desert Ass'n v. Jewell,*
    840 F.3d 562 (9th Cir. 2016) ................................................................35

*Or. Nat. Res. Council v. Allen,*
    476 F.3d 1031 (9th Cir. 2007) ...........................................3, 28, 29, 30

*Or. Natural Res. Council v. Lowe,*
    109 F.3d 521 (9th Cir. 1997) ...........................................................18, 19

*Pacific Coast Fed'n of Fishermen's Ass'ns v. Nat'l Marine Fisheries Serv.,*
    265 F.3d 1028 (9th Cir. 2001) .........................................................25, 34

*Pollinator Stewardship Council v. EPA,*
    806 F.3d 520 (9th Cir. 2015) ................................................................35

*Robertson v. Methow Valley Citizens Council,*
    490 U.S. 332 (1989) ...............................................................................5

*Russell County Sportsmen v. U.S. Forest Serv.,*
    668 F.3d 1037 (9th Cir. 2011) ..............................................................31

*San Luis & Delta-Mendoza Water Auth. v. Locke,*
    776 F.3d 971 (9th Cir. 2014) ..................................................................4

*S. Yuba River Citizens League v. Nat'l Marine Fisheries Serv.,*
    629 F. Supp. 2d 1123 (E.D. Cal. 2009) ...................................................2

*Se. Alaska Conservation Council v. U.S. Army Corps of Eng'rs*,
    486 F.3d 638 (9th Cir. 2007) ................................................................35

*Sweet Home Chapter, Communities for Greater Or. v. Babbitt*,
    515 U.S. 687 (1995) ..........................................................................2

*Tenn. Valley Auth. v. Hill*,
    437 U.S. 153 (1978) ......................................................................2, 30

*Trout Unlimited v. Lohn*,
    559 F.3d 946 (9th Cir. 2009) ............................................................2

*W. Watersheds Project v. McKay*,
    No. 22-35706, 2023 WL 7042541 (9th Cir. Oct. 26, 2023) ...................24, 26

*Wild Fish Conservancy v. Irving*,
    221 F. Supp. 3d 1224 (E.D. Wash. 2016) .........................................26

*Wild Fish Conservancy v. Salazar*,
    628 F.3d 513 (9th Cir. 2010) ...........................................................3, 4

Statutes:

5 U.S.C. § 701..........................................................................................1

5 U.S.C. § 706(2)..................................................................................2, 18

16 U.S.C. §§ 1531 ...................................................................................1

16 U.S.C. § 1531(b).................................................................................2

16 U.S.C. § 1532(19)...............................................................................2

16 U.S.C. § 1533(d).................................................................................2

16 U.S.C. § 1536(a)(2) .......................................................................3, 4, 31

16 U.S.C. § 1536(b)(4).............................................................................4

16 U.S.C. § 1536(b)(4)(C).........................................................................4

16 U.S.C. § 1538(a)(1)(B).........................................................................2

16 U.S.C. § 1539(a)(1)(B).........................................................................3

16 U.S.C. § 1539(a)(2)(A).........................................................................3

16 U.S.C. § 1539(a)(2)(B)(ii)..................................................................3, 23

16 U.S.C. § 1540(g)(1)(A).........................................................................1

28 U.S.C. § 1131......................................................................................1

28 U.S.C. § 2201......................................................................................2

42 U.S.C. § 4321 ...................................................................................................................1

42 U.S.C. § 4332(C) ...........................................................................................................4

42 U.S.C. § 4332(2)(E) .......................................................................................................5

Federal Regulations:

40 C.F.R. § 1500.1(b) (2020) .............................................................................................5

40 C.F.R. § 1502.14 (2020) ................................................................................................5

40 C.F.R. § 1502.15 (2020) ................................................................................................5

40 C.F.R. § 1508.7 (2020) ..................................................................................................5

40 C.F.R. § 1508.8(a) (2020) .............................................................................................5

40 C.F.R. § 1508.8(b) (2020) .............................................................................................5

50 C.F.R. § 17.3 (2020) ......................................................................................................2

50 C.F.R. § 17.11(h) (2020) ...............................................................................................

50 C.F.R. § 17.31(a) (2020) ................................................................................................2

50 C.F.R. § 402.14(g) (2020) .............................................................................................4

50 C.F.R. § 402.14(i)(1) (2020) ........................................................................................28

Federal Register:

*Forty Most Asked Questions about CEQ's National Environmental Policy Act Regulations,*
    46 Fed. Reg. 18,026 (March 23, 1981) ............................................................................31

*Determination of Threatened Status for the Northern Spotted Owl,*
    55 Fed. Reg. 26,114 (June 26, 1990) ............................................................................6, 8

*12-Month Finding for the Northern Spotted Owl,*
    85 Fed. Reg. 81,144 (Dec. 15, 2020) ........................................................6, 7, 9, 12, 33, 35

*California Spotted Owl; Endangered Status for the Coastal-Southern California Distinct
Population Segment and Threatened Status With Section 4(d) Rule for the Sierra Nevada Distinct
Population Segment,*
    88 Fed. Reg. 11,600 (Feb. 23, 2023) ..............................2, 6, 7, 9, 9–10, 11, 12, 33, 35

*NEPA Implementing Regulations Revisions, Phase 2,*
    89 Fed. Reg. 35,442 (May 1, 2024) ...................................................................................5

*Record of Decision for the Barred Owl Management Strategy,*
    89 Fed. Reg. 72,881 (Sept. 6, 2024) ...............................................................................12

1

Miscellaneous:

2

FED. R. CIV. P. 56(a) ............................................................................................................1, 18

3

E.D. Cal. L.R. 260 ........................................................................................................................1

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

### Glossary of Acronyms

| | |
|---|---|
| APA | Administrative Procedure Act |
| AR | Administrative Record |
| BiOp | Biological Opinion |
| CEQ | Council on Environmental Quality |
| DPS | Distinct Population Segment |
| EIS | Environmental Impact Statement |
| EPIC | Environmental Protection Information Center |
| ESA | Endangered Species Act |
| FWS | U.S. Fish and Wildlife Service |
| HCP | Habitat Conservation Plan |
| HF2H | Habitat Form 2 Heavy |
| HF4 | Habitat Form 4 |
| ITS | Incidental Take Statement |
| NEPA | National Environmental Policy Act |
| NR | Nesting/Roosting |
| NRF | Nesting/Roosting and Foraging |



Legend

- Northern Spotted Owl Plan Area
- California Spotted Owl Plan Area
- Northern Spotted Owl Action Area
- California Spotted Owl Action Area
- SPI NSO boundary
- County boundary
- River

Figure 1-1.
HCP Action Area and Plan Area Lands in the Range of the Northern and California Spotted Owl.

Administrative Record ("AR") 20527.

1   Notice of Motion.

2          Please take notice that pursuant to FED. R. CIV. P. 56(a), L.R. 260, and the Court's Order

3   of October 17, 2024 (ECF No. 35), Plaintiff Environmental Protection Information Center

4   ("EPIC") hereby respectfully files this motion for summary judgment, to be heard at the Court's

5   convenience in Courtroom 25 before the Honorable Magistrate Judge Chi Soo Kim, U.S. District

6   Court for the Eastern District of California, Robert T. Matsui U.S. Courthouse, 501 I Street,

7   Sacramento, California, 95814. This motion is supported by accompanying declarations, and

8   other evidence this Court deems appropriate.

9   Introduction.

10          The spotted owl's story is one of rapid decline. Since its listing as threatened with

11   extinction in 1990, the northern spotted owl has lost over 70 percent of its population, while its

12   cousin the California spotted owl faces similar declines. These iconic spotted owls are caught in a

13   tightening vice: intensifying wildfires consume their forest habitat, invasive barred owls force

14   them from their territories, and commercial logging eliminates forests they need to survive—all

15   while climate change accelerates these threats. Against this backdrop, Defendant U.S. Fish and

16   Wildlife Service ("FWS") chose to issue a 50-year permit to Defendant-Intervenor Sierra Pacific

17   Industries ("Sierra Pacific") allowing it to log even more of both owls' habitat, and "take"

18   hundreds of individual members of both subspecies. But instead of ensuring further take of owls

19   is minimized and mitigated to the maximum extent practicable, FWS approved Sierra Pacific's

20   proposed plan, which is built on flawed science and arbitrary assumptions. The legal failures go

21   to the heart of spotted owl survival in California's rapidly changing forestlands.

22   Points and Authorities in Support of Motion

23   Jurisdiction.

24          This case arises under the laws of the United States, including the Endangered Species Act

25   ("ESA"), 16 U.S.C. §§ 1531 et seq.; the National Environmental Policy Act ("NEPA"), 42 U.S.C.

26   §§ 4321 et seq.; and the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701 et seq. This

27   Court has jurisdiction under 28 U.S.C. § 1131 (federal question) and 16 U.S.C. § 1540(g)(1)(A)

28   (ESA citizen suit). EPIC has standing. Declarations of Dr. Monica Bond (ECF No. 38-1), Buddy

1    Hazard (ECF No. 38-2), and Nick Joslin (ECF No. 38-3). The requested relief is proper under 28

2    U.S.C. § 2201 (declaratory relief) and 5 U.S.C. § 706(2) (vacatur).

3                                    Legal Framework.

4    A.      Endangered Species Act.

5            Congress enacted the ESA in 1973 "to provide a means whereby the ecosystems upon

6    which endangered species and threatened species depend may be conserved." 16 U.S.C. §

7    1531(b). "The plain intent of Congress in enacting this statute was to halt and reverse the trend

8    toward species extinction, whatever the cost." *Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 184

9    (1978). The ESA aims "to preserve the ability of natural populations to survive in the wild" and

10   "to promote populations that are self-sustaining without human interference." *Trout Unlimited v.*

11   *Lohn*, 559 F.3d 946, 957 (9th Cir. 2009).

12           1.      Prohibited Take under the ESA.

13           The ESA's "core protection is section 9's prohibition of 'take' of a protected species." *S.*

14   *Yuba River Citizens League v. Nat'l Marine Fisheries Serv.*, 629 F. Supp. 2d 1123, 1125 (E.D.

15   Cal. 2009). Section 9 prohibits any person, including corporations, from taking an endangered

16   species. 16 U.S.C. § 1538(a)(1)(B).[1] The ESA defines "take" to mean "to harass, harm, pursue,

17   hunt, shoot, wound, kill, trap, capture, collect, or attempt to engage in any such conduct." 16

18   U.S.C. § 1532(19). Each of these types of take has independent meaning. *Sweet Home Chapter,*

19   *Communities for Greater Or. v. Babbitt*, 515 U.S. 687, 697–98, 702 (1995). "Harm" is one form

20   of take, and is defined as actions resulting in "significant habitat modification or degradation

21   where it actually kills or injures wildlife by significantly impairing essential behavioral patterns,

22   including breeding, feeding or sheltering." 50 C.F.R. § 17.3. Prohibited take need not be

23

24   [1]  FWS may extend the take prohibition to threatened species, 16 U.S.C. § 1533(d), and has done
     so for the northern spotted owl. 50 C.F.R. § 17.31(a). FWS has proposed to do so in its proposed
25   rule to list the Sierra Nevada distinct population segment ("DPS") of the California spotted owl as
     threatened, but has not acted on the proposal. *Endangered and Threatened Wildlife and Plants;*
26   *California Spotted Owl; Endangered Status for the Coastal-Southern California Distinct*
     *Population Segment and Threatened Status with Section 4(d) Rule for the Sierra Nevada Distinct*
27   *Population Segment*, 88 Fed. Reg. 11,600 (Feb. 23, 2023). If FWS lists the DPS during the life of
     ITP at issue in this case, the DPS will be covered. Administrative Record ("AR") 23052.
28

1  intentional. *Nat'l Wildlife Fed'n. v. Burlington N. R.R.*, 23 F.3d 1508, 1509 (9th Cir. 1994) (trains

2  accidentally killing grizzlies constitutes take). Instead, Section 9 "establishes a blanket

3  prohibition" on take. *Or. Nat. Res. Council v. Allen*, 476 F.3d 1031, 1033 (9th Cir. 2007).

4          2.      Incidental Take Permits.

5          Section 10 of the ESA provides exemptions from the prohibition on take. Section

6  10(a)(1)(B) allows a person who conducts a lawful activity that results in take to seek an

7  incidental take permit "if such taking is incidental to, and not the purpose of, the carrying out of

8  an otherwise lawful activity." 16 U.S.C. § 1539(a)(1)(B). An applicant for an incidental take

9  permit must develop and submit a habitat conservation plan ("HCP") specifying "(i) the impact

10 which will likely result from such taking; (ii) what steps the applicant will take to minimize and

11 mitigate such impacts, and the funding that will be available to implement such steps; (iii) what

12 alternative actions to such taking the applicant considered and the reasons why such alternatives

13 are not being utilized; and (iv) such other measures that [FWS] may require as being necessary or

14 appropriate for purposes of the plan." 16 U.S.C. § 1539(a)(2)(A). To issue an incidental take

15 permit, FWS must find "the applicant will . . . minimize and mitigate the impacts of such taking"

16 of the species "to the maximum extent practicable." 16 U.S.C. § 1539(a)(2)(B)(ii).

17         3.      "Jeopardy" and Consultation.

18         Section 7(a)(2) of the ESA requires every federal agency to insure its actions are "not

19 likely to jeopardize the continued existence" of listed species. 16 U.S.C. § 1536(a)(2). "To

20 'jeopardize the continued existence' of a species is to 'engage in an action that reasonably would

21 be expected, directly or indirectly, to reduce appreciably the likelihood of both the survival and

22 recovery of a listed species in the wild by reducing the reproduction, numbers, or distribution of

23 the species.'" *Wild Fish Conservancy v. Salazar*, 628 F.3d 513, 518 (9th Cir. 2010) (quoting 50

24 C.F.R. § 402.02)). "[T]he jeopardy regulation requires [the consulting agency] to consider both

25 recovery and survival impacts." *Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 524 F.3d

26 917, 931 (9th Cir. 2008). "The goal of the ESA is not just to ensure survival, but to ensure that the

27 species recovers to the point that it can be delisted." *Alaska v. Lubchenco*, 723 F.3d 1043, 1054

28 (9th Cir. 2013) (internal citation omitted).

1    Where a federal action is likely to adversely affect a listed species, FWS must prepare a

2    Biological Opinion ("BiOp") to address the status of the species and analyze whether the

3    proposed action, along with other direct, indirect, and cumulative effects, will jeopardize it. *Wild*

4    *Fish*, 628 F.3d at 518 (citing 50 C.F.R. § 402.14(g)). If FWS determines an action is not likely to

5    jeopardize a species, it must still determine whether the action is likely to result in incidental take

6    of individual members of the species. 16 U.S.C. § 1536(b)(4). If FWS determines an action "is

7    reasonably certain" to result in incidental take, it must issue an incidental take statement ("ITS").

8    50 C.F.R. § 402.14(g)(7); 16 U.S.C. § 1536(b)(4). An ITS must (i) specify the impact of

9    incidental taking; (ii) specify reasonable and prudent measures that are necessary or appropriate

10   to minimize such impact; and (iv) set forth the terms and conditions that the agency and/or third

11   party must comply with in order to implement specified reasonable and prudent measures. 16

12   U.S.C. § 1536(b)(4)(C). An ITS "functions as a safe harbor provision immunizing persons" from

13   take liability. *Ariz. Cattle Growers' Ass'n v. FWS*, 273 F.3d 1229, 1239 (9th Cir. 2001).

14       4.    The "Best Scientific and Commercial Data Available" Standard.

15   When administering the ESA, FWS must use "the best scientific and commercial data

16   available." 16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402.14(g)(8). "[F]ailure to do so violates the

17   APA." *San Luis & Delta-Mendoza Water Auth. v. Locke*, 776 F.3d 971, 995 (9th Cir. 2014). The

18   best scientific data standard exists to ensure a BiOp is not based on "speculation and surmise." *Id*.

19   The standard requires agencies "to consider the scientific information presently available" and

20   "give 'the benefit of the doubt to the species[.]'" *Brower v. Evans*, 257 F.3d 1058, 1070 (9th Cir.

21   2001) (citation omitted). This "plac[es] the burden of risk and uncertainty on the proposed

22   action." *Intertribal Sinkyone Wilderness Council v. Nat'l Marine Fisheries Serv.*, 970 F. Supp. 2d

23   988, 997 (N.D. Cal. 2013) (citing *Sierra Club v. Marsh*, 816 F.2d 1376, 1386 (9th Cir. 1987).

24   B.   National Environmental Policy Act.

25   NEPA requires federal agencies to prepare an environmental impact statement ("EIS") for

26   "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. §

27   4332(C). The purpose is two-fold: to (1) ensure the agency has detailed information on significant

28   environmental impacts before it undertakes actions; and (2) ensure this information is made

public. *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989). An EIS must take a "hard look" at the environmental consequences of a proposed action, including direct, indirect, and cumulative effects of the action. *Id*. at 350. Direct impacts are caused by the action and occur at the same time and place. 40 C.F.R. § 1508.8(a).[2] Indirect impacts are caused by the action and are later in time or farther removed, but still reasonably foreseeable. 40 C.F.R. § 1508.8(b). Cumulative impacts represent the "incremental impact of the action . . . added to other past, present, and reasonably foreseeable future actions" undertaken by any person or agency. 40 C.F.R. § 1508.7. In analyzing all effects, an EIS must be based on "high quality" information. 40 C.F.R. § 1500.1(b); *Lands Council v. Powell*, 395 F.3d 1019, 1032 (9th Cir. 2005).

An EIS must consider all reasonable alternatives to a proposed federal action. 42 U.S.C. § 4332(2)(E). A discussion that "sharply defin[es] the issues and provid[es] a clear basis for choice" among various alternatives "is the heart of the [EIS]." 40 C.F.R. § 1502.14. To properly consider and disclose the effects of a proposed action, an EIS must include "the alternative of no action," which is the "baseline" against which the effects of other alternatives are evaluated. *Friends of Yosemite Valley v. Kempthorne*, 520 F.3d 1024, 1032 (9th Cir. 2008) (quoting 40 C.F.R.§ 1502.14(d)). This means the EIS must "describe the environment of the area(s) to be affected or created by the alternatives under consideration," setting forth the baseline conditions of an area before a proposal is implemented. 40 C.F.R.§ 1502.15.

Factual Background.

This case concerns an incidental take permit issued by FWS to Sierra Pacific, authorizing it to take northern and California spotted owls when it logs its lands in northern California and the Sierra Nevada in California. EPIC first addresses the owls, then Sierra Pacific's proposed HCP, and then FWS's BiOp and EIS evaluating the permit.

A.    Spotted Owls.

---

[2]   All citations to Title 40 of the Code of Federal Regulations refer to the 2020 edition. After the FWS's actions challenged here, the Council on Environmental Quality ("CEQ") amended its NEPA regulations. *NEPA Implementing Regulations Revisions, Phase 2*, 89 Fed. Reg. 35,442 (May 1, 2024). However, FWS's actions are reviewed under the regulations "in effect at the time this dispute arose," *Chase Bank USA, N.A. v. McCoy*, 562 U.S. 195, 204 (2011), meaning the NEPA regulations in effect on July 21, 2020.

The northern spotted owl and California spotted owl are two of three sub-species of the spotted owl (*Strix occidentalis*).[3] 88 Fed. Reg. at 11,603. There is some overlap in the two subspecies' range in California, and interbreeding between them occasionally occurs, but they are distinct. *Id.*; AR 27751 (comparison of subspecies). FWS uses the Pit River area in Shasta County as the dividing line between their ranges. *Determination of Threatened Status for the Northern Spotted Owl*, 55 Fed. Reg. 26,114, 26114 (June 26, 1990).

      1.     The Northern Spotted Owl.

Northern spotted owls (*Strix occidentalis caurina*) are dark brown and have small white spots and markings. 55 Fed. Reg. at 26115. Relative to other owls in North America, northern spotted owls have relatively long lives, and long reproductive life spans. *12-Month Finding for the Northern Spotted Owl*, 85 Fed. Reg. 81,144, 81,145 (Dec. 15, 2020). Northern spotted owls invest in parental care and, relative to other owls, exhibit high adult survivorship. *Id*. The historic range of the northern spotted owl includes forests throughout the Pacific Northwest, from southwestern British Columbia south to Marin County, California. *Id*. Its present range is smaller now because it is "extirpated or very uncommon" in some areas of Washington state and British Columbia. *Id*.

In 1990, FWS listed the northern spotted owl as threatened with extinction under the ESA. 55 Fed. Reg. at 26,114, *codified at* 50 C.F.R. § 17.11(h). The main reasons for listing the northern spotted owl included widespread habitat loss from logging across its range, *id*. at 26,175–86, and the lack of regulatory mechanisms to protect remaining owls. *Id*. at 26,187–92. Despite some protections afforded by virtue of its listing under the ESA, in 2020, FWS determined that "uplisting" the northern spotted owl to endangered status is warranted, due to continued habitat loss, and new competition with barred owls. 85 Fed. Reg. at 81,144However, FWS did not uplist the species because it was "precluded by higher priority actions." *Id*. FWS has found that "[p]opulations of northern spotted owls in several long-term demographic monitoring areas have declined more than 70 percent since the early 1990s," and the overall rate of decline "has

---

[3]   The third is the Mexican spotted owl. 88 Fed. Reg. at 11,603.

1   increased noticeably" since the most recent 5-year species status review in 2011. 85 Fed. Reg. at

2   81,145. The most recent range-wide northern spotted owl demographic study found an overall

3   annual population decline of 3.8%. *Id*.

4             2.      The California Spotted Owl.

5             The California spotted owl (*Strix occidentalis occidentalis*) includes two DPSs in

6   California: the Sierra Nevada DPS and the Coastal-Southern California DPS. 88 Fed. Reg. at

7   11,600. The Sierra Nevada DPS is at issue in this case, and in California is found in the Sierra

8   Nevada Mountain Ranges and foothills, from Shasta County south to the Tehachapi Pass in Kern

9   County. *Id*. at 11,603. California spotted owls are medium-sized brown owls with a mottled

10  appearance, round face, large pale brown facial disks, and dark brown eyes. *Id*. They are long-

11  lived (approximately 16–23 years), with high adult survival and low reproductivity. *Id*. They have

12  high site fidelity: they "select and defend territories in which they spend most of their life." *Id*. at

13  11,611. They have the lowest genetic diversity of any spotted owls, suggesting populations may

14  be "much smaller than the northern and Mexican spotted owl populations." *Id*. at 11,603.

15            In 2023, FWS found the California spotted owl within the Sierra Nevada DPS is "likely to

16  become in danger of extinction within the foreseeable future," and proposed to list it as threatened

17  with extinction under the ESA. *Id*. at 11,631. In the proposed rule, FWS stated that "[i]n many

18  instances . . . data are insufficient or completely lacking" as to population sizes and growth rates

19  of California spotted owls, so FWS often relies on "surrogate indicators" such as suitable habitat,

20  food, and breeding sites. *Id*. at 11,610. However, studies from 1990–2011 showed California

21  spotted owl population declines of 11% in the Lassen National Forest and 21% in the Sierra

22  National Forest, while the Eldorado Study Area saw a 29% decline from 1993–2010. AR 87.

23  B.        Spotted Owl Habitat.

24            The habitat requirements for northern and California spotted owls vary by region. In

25  northern California, where Sierra Pacific's lands include northern spotted owl habitat, these owls

26  occupy mixed-conifer and Douglas fir-dominated forests. AR 45871–72, 28499. In the Sierra

27  Nevada DPS, where California spotted owls occur on Sierra Pacific's lands, the species inhabits

28  mixed-conifer, ponderosa pine, and red fir forests. AR 36784, 46717.

1   Generally, spotted owls are closely associated with late-successional and old-growth

2   forests. AR 22976, 39343. However, both northern spotted owls and California spotted owls are

3   known to occupy younger, managed forests, as well as mixed-age stands in the regions where

4   Sierra Pacific logs, particularly when late-successional or old-growth habitat no longer exists. AR

5   23907, 32815, 32819. For example, the northern spotted owl in its southernmost physiographic

6   provinces has adapted to using previously-logged forests that retain or have regrown key habitat

7   elements. AR 32819. Similarly, California spotted owls in the Sierra Nevada can successfully use

8   managed forests, if and when they contain adequate structural elements. *Id*.; AR 48368.[4]

9   The essential habitat elements for both owls include a multi-layered and multi-species tree

10   canopy dominated by large over-story trees with moderate to high canopy closure, high incidence

11   of trees with large cavities and other deformities, numerous large snags, abundant large dead

12   wood on the ground, and open space within and below the upper canopy for owls to fly. AR

13   69256 (northern spotted owl), 65086 (California spotted owl). Forested stands with high canopy

14   closure also provide thermal cover and protection from predation. AR 39257. Spotted owl habitat

15   with these structures and features is known as "Nesting/Roosting, Foraging" ("NRF") habitat. AR

16   37662.[5] Spotted owls have higher survival rates and better fitness in larger forest patches, while

17   their survival and fitness is negatively correlated with fragmented forests. AR 46695.

18   Juvenile spotted owls require forest habitat to disperse into new territories. AR 45706,

19   47019. Dispersal habitat consists of stands with adequate tree size and canopy closure to protect

20   juvenile owls from avian predators, and provide foraging opportunities. AR 49793. Dispersal

21   habitat may include younger and less diverse forest stands than NRF habitat, if such stands

22   contain some roosting structures and features that provide foraging opportunities to allow for

23   temporary resting and feeding. *Id*. Successful dispersal of juvenile owls is essential to maintaining

24   
---

25   [4]   This does not mean spotted owls prefer or will flourish in logged forests that have regrown
some habitat; it means that where aspects of preferred habitat are available, spotted owls may

26   survive in them. AR 33090, 33096–98.

27   [5]   These habitat attributes can sometimes be found in younger forests, particularly those with
significant remnants of earlier stands influenced by fire, windstorms, inefficient logging, or

28   selective logging. 55 Fed. Reg. at 26,116.

stable owl populations because it fills territorial vacancies when resident spotted owls die or leave their territories, and provides adequate gene flow across the range of the species. AR 39260.

C.     Threats to Spotted Owls.

The most recent Species Status Review for the northern spotted owl and the proposal to list the Sierra Nevada DPS of the California spotted owl identify primary threats to the species.

1.     Habitat Loss Due to Logging.

As noted, habitat loss caused mostly by logging was the primary factor leading to the listing of the northern spotted owl in 1994 and, in 2020, FWS found that habitat loss "continues to be a stressor on the subspecies due to the lag effects of past habitat loss, [and] continued timber harvest." 85 Fed. Reg. at 81,145. For the Sierra Nevada DPS of California spotted owl, "even in the more optimistic of the plausible future scenarios, habitat is still projected to severely decline," and that "many parts of the [species] range may become extirpated." 88 Fed. Reg. at 11,630.

Spotted owl habitat loss caused by clearcut logging[6]—and the even-aged management plantations that replace that lost habitat—creates conditions for even further degraded habitat. Even-aged tree plantations increase wildfire spread rates because they are densely spaced and have low-hanging limbs. AR 22954. Even-aged stands also have lower relative humidity, and allow higher wind speeds than uneven-aged forest stands, which create highly-flammable conditions that persist for over a decade after initial regrowth. AR 22954. Even at "mid-seral" (mid-age), even-aged forest stands remain vulnerable to disease, drought, and fire. AR 22990. By contrast, late seral and old-growth stands buffer against wildfire. *Id*. It takes "many decades to centuries" for trees to attain large diameters and complex structures that allow them to function both as nest trees for spotted owls, and as a moderating force on within-tree stand temperatures. AR 48389. "Thus, it may require long time periods to develop the large tree vertical structure used by owls in areas where such structure does not now exist." *Id*.

2.     Climate Change.

FWS has found climate change is occurring, and the rate of change has steadily increased

---

[6] "Clearcutting, sometimes referred to as even-aged management . . . removes all trees in the stand." 88 Fed. Reg. at 11,616.

since the 1950s. 88 Fed. Reg. at 11,614. Climate change is now poised to profoundly affect every region of California. AR 24649, 25420. Average temperatures in the North Coast and Klamath regions are projected to increase by 3.0˚F to 3.4˚F by 2070 and 2.7˚F to 8.1˚F by 2099; in the Southern Cascades region by 3.2˚F to 4.0˚F by 2070, with larger increases in the mountains; and in the Sierra Nevada region by 3.2˚F to 4.3˚F by 2070, and 6.5˚F to 6.8˚F by 2100. AR 21830.

Climate change will have "both direct and indirect effects" on spotted owls. AR 65578. Climate change is projected to directly affect spotted owl physiology, survival, reproduction, recruitment, and population growth. AR 65580–81. Spotted owls experience heat stress above 35.2°C, while wet, cold weather in winter and early breeding season negatively affects their reproduction, survival, recruitment, and population growth. *Id*. Cold, wet conditions can increase energy costs for thermoregulation, reduce hunting success, cause egg failure through chilling, and directly kill nestlings. *Id.* While late summer rainfall can positively affect owl populations by supporting prey abundance, drought and high temperatures in the summer decrease owl survival and recruitment. *Id*. Spotted owl populations show varying responses to climate conditions, with temperature changes having a greater impact than precipitation changes, and reproductive rates being more affected than survival. AR 65581–82. The indirect effects of climate change on spotted owls are projected to include "(1) geographical shifts in habitat distribution, abundance, and quality; (2) increase of high-severity wildfire; (3) increase in mature/large tree mortality caused by insects and disease; (4) changes in prey distribution, abundance, and population dynamics; (5) changes in interspecific interactions with competitors and predators; and (6) changes in disease dynamics associated with changing temperature and precipitation patterns." *Id*.

Climate change is currently causing forest ecosystem changes of increasing intensity and unpredictability, including patterns of insect outbreaks, drought, disease, and wildfire. AR 21830. A notable impact in California is climate change is decreasing low-elevation forests and causing shifts in tree line elevations. AR 21831. Further, these shifts are expected to make any remaining forests more susceptible to disturbance. AR 21830–31. All of these changes will influence the extent and distribution of suitable habitat for northern and California spotted owls, AR 22990, and cause a shift in their distribution to remaining suitable habitat. AR 48388.

3. <u>Habitat Loss Due to Fire</u>.

FWS has found that wildfire is, historically, a natural part of spotted owl habitat in California, and necessary for healthy, heterogenous forest ecosystems. 88 Fed. Reg. at 11,611. However, combined effects from recent extended droughts, hotter summers, longer fire seasons, and over a century of fire suppression have led "to larger and more severe fires across the range of the California spotted owl, most notably in mixed-conifer forests." AR 67583. FWS found that "[i]n 2020 and 2021, more than 1 million [hectares] (2.4 million [acres]) burned in California, resulting in more areas burned over these 2 years than in the past 7 years of all California fires combined." 88 Fed. Reg. at 11,612–13. For the California spotted owl, FWS has found it "is currently being impacted by high-severity fire," *id.* at 11,600, and that "[b]ased on fire activity and anticipated trends over the next 75 years, the cumulative amount of [California spotted owl] nesting habitat burned at ≥50 percent tree basal mortality will exceed the total existing habitat in the Sierra Nevada." *Id.* at 11,613 (study citation omitted). "In other words, the loss of suitable California spotted owl habitat would exceed the rate of new forest growing post-fire." *Id.* This is particularly concerning for forests on private lands: FWS has found "the odds of high severity fire occurring on industrially managed forests and adjacent lands were 1.8 and 1.4 times higher." *Id.*[7]

4. <u>Barred Owls</u>.

Barred owls (*Strix varia*) are native to mixed hardwood and coniferous woodlands east of the Rocky Mountains ranging from the east coast of the United States to the western Canadian provinces but historically were most abundant in eastern North America. AR 47106. Since the 1960s, barred owls have rapidly expanded into the Pacific Northwest, and relatively recently appeared in California. AR 47106–08, 64241. Barred owls are larger and more aggressive than spotted owls. AR 27872. A primary reason barred owls pose a threat to spotted owls is that barred owls outcompete spotted owls across all kinds of habitat, and they adapt to inferior habitat and prey more readily than spotted owls. *Id.*; AR 40408, 47502–04. The most recent range-wide

---

[7]   Data show similar impacts on the northern spotted owl. From 1993 to 2012, wildfire burned 505,800 acres of nesting/roosting habitat for the subspecies, AR 22990, and loss of habitat due to wildfire in the next 50 years is projected to reach 1,155,400 acres range-wide. AR 21827.

1   northern spotted owl demographic study found that barred owls are currently the stressor with the

2   largest negative impact on northern spotted owls by competing for resources. 85 Fed. Reg. at

3   81,145. Similarly, threats from barred owls are among the factors that led FWS to propose listing

4   the Sierra Nevada DPS of the California spotted owl, and this threat is "anticipated to increase

5   into the foreseeable future." 88 Fed. Reg. at 11,630.

6       Before FWS issued the BiOp and EIS in this case, FWS experimented with removing

7   barred owls to gauge effects on the survival and recovery of spotted owls. AR 40037–40541

8   (2013 EIS), AR 70799–70827 (2016 Progress Report). FWS has since issued a strategy to remove

9   barred owls from some spotted owl habitat, including in California. *Record of Decision for the*

10  *Barred Owl Management Strategy*, 89 Fed. Reg. 72,881, 72,882 (Sept. 6, 2024). FWS anticipates

11  that if barred owls are successfully removed, the availability of adequate forest habitat will again

12  be the primary factor limiting the survival and recovery of spotted owls. AR 39048, 43783.

13  D.   Sierra Pacific.

14      Sierra Pacific is the largest private landowner in California, owning approximately 1.85

15  million acres of mostly forestlands in parts of the Klamath Mountains, the Southern Cascades,

16  and the Sierra Nevada regions of California. AR 21691–93, 17560. The land ownership pattern of

17  Sierra Pacific forestlands "consists of both large contiguous tracts of land and a significant

18  number of smaller non-contiguous tracts," much of which "are mixed with [Forest Service] lands

19  in a 'checkerboard' ownership pattern." AR 21693.[8] The dominant forest types on Sierra Pacific

20  forestlands include ponderosa pine; Douglas fir; Klamath and Sierra mixed conifer (ponderosa

21  pine, sugar pine, white fir, Douglas fir, incense cedar); mixed hardwood-conifer; black oak; red

22  fir; white fir; and Jeffrey pine. *Id.*

23      Sierra Pacific manages its forestlands primarily for clearcut logging (also known as

24  regeneration harvest) and commercial and pre-commercial thinning. AR 20574–75.[9] Since 1999,

25  _____

    [8]  Federal land grants to early western railroads created the checkerboard pattern. AR 55637.

26
    [9]  As noted, clearcutting means removing all trees from an area, while "[c]ommercial thinning is
27  the removal of trees in a young-growth stand to maintain or increase average stand diameter of
    the residual crop trees, promote timber growth, and/or improve forest health." AR 16230. Pre-
28

1  Sierra Pacific has primarily clearcut its forestlands, which, after replanting, contributed to

2  converting 29% of its lands—around 500,000 acres—into regenerated, or even-aged, forests. AR

3  20575–76. Sierra Pacific reports that as of 2016, 1% of its lands are older, even-aged forests that

4  are thinned at 30 to 60 years, and then clearcut; 2% do not support conifers; 5% are not available

5  for logging; 28% are regenerated stands; and 64% consist of forest "containing a mix of trees in

6  various sizes and ages [and] often contains [diameter breast height] of 12–24 inches and canopy

7  cover over 50%" that will be logged. AR 20574. Sierra Pacific reported that as of 2016, "no

8  unentered old-growth forests remain" on its forestlands in California. AR 20575.

9       As for owls, Sierra Pacific's forestlands include 377,442 acres within the range of the

10  northern spotted owl, and 1,118,265 acres within the range of the California spotted owl. AR

11  17560. Sierra Pacific reports that "[v]irtually all [owl] nesting habitat for spotted owls on [its]

12  property today is in the Mixed land class, existing as a legacy of past management." AR 20575.

13  E.   Habitat Conservation Plan.

14       On December 19, 2018, Sierra Pacific proposed to FWS an HCP and applied for an

15  incidental take permit to conduct logging on 1,565,707 acres of its forestlands over a 50-year

16  term, and incidentally take 115 northern spotted owls and 649 California spotted owls. AR 21691,

17  22931, 22959. The northern spotted owl HCP area includes 377,442 acres in the Trinity and

18  Cascade Mountains of northern California, and the California spotted owl HCP area includes

19  1,188,265 acres in the Modoc Plateau, Cascade Mountains, and Sierra Nevada Mountains in the

20  northern and eastern portions of the state. AR 22931.

21       1.   Covered Activities.

22       The HCP covers most activities associated with commercial logging, including the felling,

23  yarding, and salvage of trees; building, maintaining, and decommissioning roads and landings;

24  converting brush to tree plantations; building "fuel breaks;" suppressing fire; and other related

25  activities. AR 20535–46.

26       2.   Habitat Forms, Hexagon Analysis, and Accounting for Take.

27  _____

28  commercial thinning is "[t]he practice of reducing the density of trees within a stand," by logging
trees that "are generally not merchantable and not removed from the treated area." AR 57368.

To evaluate the distribution of potentially suitable spotted owl habitat on its lands, and to project and track the quantity of such habitat over the 50-year term of the HCP, Sierra Pacific developed a "hexagon analysis tool." AR 20581. The tool is based on a network of 500-acre hexagons across all of the company's lands, and adjacent areas ranging up to one-half mile from those lands. *Id*. Each hexagon is evaluated via a Habitat Form as to whether it includes potential suitable spotted owl habitat and, if so, how much. AR 20581–82. For example, Habitat Form 4 ("HF4") represents large tree and high canopy cover conditions, including either 120+ year old mixed forest stands or 35+ year old even-aged stands of "large tree closed canopy forest," with at least 60% canopy cover, a quadratic mean diameter of trees of at least 13" diameter breast height ("dbh"), and at least one suitable nest structure per stand. AR 20581, 20578. By contrast, Habitat Form 2 Heavy ("HF2H") represents medium tree and high canopy cover conditions. AR 20581.

Based on their habitat form composition, hexagons containing potentially suitable spotted owl habitat are categorized as Nest Hexagons (at least 30% HF4, at least 50% HF4 and/or HF2H, and at least one potential nest stand of at least 50 acres that includes at least 30 acres of HF4 and 20 acres of HF4 and/or HF2H), Support Hexagons (at least 50% HF4 and/or HF2H), or Below Threshold Hexagons (neither 30% HF4, nor 50% HF4 and/or HF2H). AR 20582. "Habitat in a Support Hexagon provides support for nest hexagons by including surrounding high canopy cover, occasional use for nesting and roosting, and stands that will grow into nesting habitat in a relatively short period." *Id*. Sierra Pacific aggregates two adjacent qualifying 500-acre hexagons into 1,000-acre Potential Habitat Areas. *Id*. Each Potential Habitat Area must consist of one Nest Hexagon and one Support Hexagon, or two Nest Hexagons. *Id*.

The HCP uses the hexagon analysis tool to measure take. AR 20621–22. Sierra Pacific maintains a database of the locations of all occupied spotted owl activity centers that can be intersected with the hexagon network. *Id*. One instance of take occurs if (1) logging occurred in a hexagon in a five-year period during which it was known to be occupied by spotted owls at the baseline modeling date at the onset of that period, and (2) either logging caused the hexagon to drop below threshold, or logging occurred in a hexagon that was already below threshold at the beginning of the period. *Id*.

3.      Conservation Measures.

Sierra Pacific proposed eight conservation measures in the HCP to meet its duty to minimize and mitigate the impacts of take to the maximum extent practicable. The first, second, third, and fifth are relevant to EPIC's claims. AR 20591–95.

a.      Conservation Measure 1.

The first conservation measure is intended to "increase the amount and distribution of habitat contributing to survival and reproduction" of spotted owls in the covered area over the permit term. AR 20591. The HCP states Sierra Pacific "will identify, maintain, restore, and increase aggregations of habitat accounted for" by spotted owl Potential Habitat Areas comprised of at least 50 percent nesting habitat (HF4 and HF2H). *Id*. Over the first 20 years, the number of acres qualifying as Potential Habitat Areas is projected to decrease from 870 to 832 (4% reduction), followed by an upward trend over the next 30 years that will result in a total of 1,729 (199% increase). *Id*.

b.      Conservation Measure 2.

The second conservation measure establishes "protection zones" around occupied spotted owl activity centers, and limits logging in these zones. AR 20592. Protection zones are between 72 and 100 acres. AR 20154. There were 428 protection zones on or within 0.25 miles of the HCP Area in 2018, with an average of 59 acres of Sierra Pacific land each. AR 20592. A protection zone may be removed after three consecutive yearly surveys show the owl activity center is unoccupied. *Id*. The measure includes provisions to maintain baseline protection levels, requiring Sierra Pacific to retain at least 80% of each subspecies' baseline protection zone acreage (19,245 acres for California spotted owls; 2,502 acres for northern spotted owls) even if activity centers move or decline. *Id*. Of the initial 367 protection zones overlapping Sierra Pacific lands, its ownership averages 59 acres, representing 60% of the average 98-acre protection zone. *Id*.

At the hexagon scale, the second conservation measure establishes thresholds for how much habitat around occupied activity centers can be modified, in order to limit the reduction of HF4 and HF2H habitat types. *Id*. The second conservation measure sets up a four-tier system providing different levels of protection to northern spotted owl activity centers. AR 20593. Tier 1

1   actitivy centers receive the highest protection, with 11,762 acres designated as long-term habitat

2   refugia where Sierra Pacific will not log trees except for salvage. *Id*. Tier 2 activity centers must

3   maintain 50% combined HF4 and HF2H habitat, and receive protection zones when occupied. *Id*.

4   Tier 3 activity centers are those where Sierra Pacific lands within an owl home range are deemed

5   insignificant, though protection zones are still required if owls move within 0.25 mile of the Plan

6   Area. *Id*.  Tier 4 activity centers are considered to be of low conservation value, but protection

7   zones are designated if they become reoccupied. *Id*. This four-tier system does not protect

8   California spotted owls. *Id*.

9                  c.      Conservation Measure 3.

10         The third conservation measure sets standards to retain trees when conducting salvage

11   logging of "Substantially Damaged Timberlands" as defined in the California Forest Practice

12   Rules ("State Rules"). The State Rules define "Substantially Damaged Timberlands" as "areas of

13   Timberland where wildfire, insects, disease, wind, flood, or other blight caused by an act of God

14   occurs after January 1, 1976 and the damage reduced [s]tocking below [applicable]

15   requirements[.]" AR 22142. The State Rules define salvage logging as "the removal of only those

16   trees which are dead, dying or deteriorating, because of damage from fire, wind, insects, disease,

17   flood or other injurious agents." AR 22175–76. The "Substantially Damaged Timberland"

18   designation is made by a "Registered Professional Forester" contracted, here, by Sierra Pacific.

19   AR 22318, 22505, 20541.

20         The third conservation measure requires 0.4-acre habitat retention areas for every 20 acres

21   that are salvage logged, excluding watercourse and lake protection zones. AR 20594. Under the

22   State Rules, all undamaged green trees must be retained within the damaged area, but if all trees

23   are dead, the 0.4-acre standard may be met with dead trees. *Id*. Habitat retention areas are

24   established around wildlife trees where available, and must include undamaged green trees most

25   likely to persist. *Id*. In fire-killed areas, the standards for additionally retained trees do not apply

26   since fire-killed conifers will not persist. *Id*. Instead, fire-killed hardwood trees are retained at one

27   per 2 acres when available, with preference given to trees larger than 22 inches dbh. *Id*.

28   Reforestation is not required under the State Rules for "Emergency Notice operations," but that is

1   not a condition of the HCP; Sierra Pacific reforests timber-capable areas after salvage logging. *Id*.

2      d. <u>Conservation Measure 5.</u>

3      The fifth conservation measure requires Sierra Pacific to survey for owls before logging

4   according to the protocol in Appendix 5.4 of the HCP. AR 20598–99, 12523–71. The survey

5   protocol requires surveys of HF4 and HF2H within 0.5 miles of proposed logging and other

6   activities via nighttime spot calling, walking surveys, and daytime follow-up visits. AR 12531–

7   36. The protocol requires two years of surveys, including three visits annually, in areas without

8   barred owls, or six visits annually in areas with barred owls, with visits spaced 13 days apart

9   during March 15 through August 31. AR 12537–38, 12551. Follow-up visits within 72 hours after

10   nighttime owl detections are required. AR 12541, 12544.

11   F. <u>Biological Opinion and Incidental Take Statement</u>.

12      On September 25, 2020, FWS issued a BiOp finding that the HCP and permit are not

13   likely to jeopardize the continued existence of the northern or California spotted owl or result in

14   destruction or adverse modification of the species' critical habitat. AR 22925, 22955–56. The

15   BiOp is accompanied by an ITS. AR 22956–60. The ITS includes non-discretionary terms and

16   conditions, Sierra Pacific must "conduct monitoring and adaptive management, submit an annual

17   report, and conduct biannual meetings with the Service[.]" AR 22961–60.

18   G. <u>Environmental Impact Statement</u>.

19      On July 21, 2020, FWS issued an EIS to evaluate the effects of approving the HCP and

20   issuing the permit. AR 21679, 21681. The EIS considers three alternatives, two of which are

21   relevant to EPIC's claims. AR 21681.[10] First, FWS considers a "No Action Alternative" of not

22   issuing the permit. *Id*. The EIS assumes assumes if a permit were not issued, Sierra Pacific would

23   continue logging its lands, but "[n]o additional conservation measures, beyond what is required

24   by the State Rules and Sierra Pacific's other existing land use conservation plans, would be

25   implemented to accomplish habitat conservation plan (HCP) goals." AR 21701.

26      [10] FWS considered and rejected an alternative whereby Sierra Pacific would develop an HCP

27   conforming to management protocols in the Northwest Forest Plan and Sierra Nevada Forest Plan
   Amendment, which currently apply only to federal public lands. AR 21682.

28

1    Second, the EIS considers the "HCP Alternative"—to issue a 50-year permit to Sierra

2  Pacific and authorize the incidental take of owls resulting from Sierra Pacific's logging and

3  related activities in California. AR 21681. The EIS states this alternative would have a

4  "[b]eneficial effect compared to the No Action Alternative because of additional conservation

5  measures . . . and habitat element retention during timber harvest." AR 21683. The EIS states this

6  alternative would lead to increased "high canopy cover, large tree habitat . . . with an increase in

7  [Potential Habitat Areas] from 147 in 2016 . . . to 497 in 2066[.]" AR 21683.

8    On September 24, 2020, FWS issued a Record of Decision to adopt the HCP alternative.

9  AR 22904–23. On September 30, 2020, FWS issued its findings and recommendations on the

10  HCP, AR 23055–68, and issued the permit. AR 23050–54.

11                Standard of Review.

12    Summary judgment is appropriate if "there is no genuine issue as to any material fact and .

13  . . the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). The APA

14  provides the standard of judicial review for claims under the ESA, *Karuk Tribe v. U.S. Forest*

15  *Serv.*, 681 F.3d 1006, 1017 (9th Cir. 2012) (en banc), and NEPA, *Native Ecosystems Council v.*

16  *Dombeck*, 304 F.3d 886, 891 (9th Cir. 2002). Under the APA, "[t]he reviewing court shall . . .

17  hold unlawful and set aside agency action, findings, and conclusions found to be arbitrary,

18  capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. §

19  706(2)(A). An agency action is arbitrary and capricious "if the agency relied on factors Congress

20  did not intend it to consider, 'entirely failed to consider an important aspect of the problem,' or

21  offered an explanation 'that runs counter to the evidence before the agency or is so implausible

22  that it could not be ascribed to a difference in view or the product of agency expertise.'" *Lands*

23  *Council v. McNair*, 537 F.3d 981, 987 (9th Cir. 2008) (internal citation omitted), *overruled on*

24  *other grounds*, *Los Angeles v. FAA*, 63 F.4th 835, 842 (9th Cir. 2023).

25    Though deferential, the "arbitrary and capricious" standard does not shield agency

26  decisions from "thorough, probing, in-depth review." *Citizens to Pres. Overton Park, Inc. v.*

27  *Volpe*, 401 U.S. 402, 415 (1971), *abrogated on other grounds*, *Califano v. Sanders*, 430 U.S. 99,

28  97 (1977). FWS must articulate "a rational connection between the facts found and the

1  conclusions made." *Or. Nat. Res. Council v. Lowe*, 109 F.3d 521, 526 (9th Cir. 1997). FWS is not

2  entitled to deference where its conclusions "do not have a basis in fact." *Ariz. Cattle Growers'*

3  *Ass'n,* 273 F.3d at 1236. Its decision can be upheld only on the basis of its reasoning; the

4  reviewing court cannot substitute reasons for agency action. *Anaheim Mem'l Hosp. v. Shalala*,

5  130 F.3d 845, 849 (9th Cir. 1997).

6  Argument.

7  A.  <u>The HCP Fails to Sufficiently Minimize and Mitigate Impacts of Take</u>.

8  The HCP authorizes Sierra Pacific to take 115 northern spotted owls and 649 California

9  spotted owls over the 50-year term of the permit through logging and modifying habitat. AR

10  20629. The HCP includes conservation measures to minimize and mitigate these impacts, but

11  three of the measures—governing habitat protection, surveys, and salvage logging—fail to

12  incorporate the best available science. This renders unlawful both the HCP and the permit.

13      1.  <u>Measure 1 Relies on Habitat Thresholds and Definitions Inconsistent with the Best Available Science</u>.

14

15  The first conservation measure aims to increase spotted owl Potential Habitat Areas over

16  50 years. AR 20591. The HCP projects an increase in that period from 147 Potential Habitat

17  Areas to 497 in the northern spotted owl portion of the covered area, and from 723 to 1,232 in the

18  California spotted owl portion. AR 22935. The habitat definitions and protection thresholds that

19  underlie these assumptions contradict the best available science in three respects.

20  First, the HCP's definition of nesting habitat (HF4) relies on parameters that overestimate

21  the amount of potentially suitable nesting habitat. The HCP assumes HF4 is preferred nesting

22  habitat, despite using lower canopy cover and other key parameters than those established by the

23  HCP's own Appendix 3.4, AR 19229–76, and leading scientific studies. AR 34496. Appendix 3.4

24  demonstrates that spotted owls strongly select for stands with higher mean tree diameter and

25  higher density of larger trees. AR 19236–40. Specifically, owl activity centers had roughly twice

26  as much nesting habitat (characterized by larger trees) within 500-acre circles compared to

27  random areas, and this selection was statistically significant across all study regions. AR 19239.

28  The HCP's reliance on the less stringent HF4 standards is inconsistent with Appendix 3.4.

1    This disconnect is further shown by Sierra Pacific's data in Appendix 3.8, which fail to

2    show strong selection for HF4. AR 19349–51 (Tables 3–5); 19358–60 (Figures 5–7). In contrast,

3    studies consistently show spotted owls select stands with higher basal area, high canopy, and high

4    density of large trees. AR 35546 (Tempel 2016), 33094 (Jones 2018), 70935 (Blakey 2019). Of

5    note, Tempel (2016) found that "forest with 40–69% canopy cover cannot simply be substituted

6    for forest with >70% canopy cover," and emphasized the documented importance of >70%

7    canopy cover forests for nesting and roosting. AR 35561. Similarly, Jones (2018) "found that

8    local extinction rates were higher when owl territories contained less forest characterized by large

9    trees (>61 cm dbh) and high canopy cover (>70%), and extinction rates declined as this forest

10   type increased." AR 33094. By using less stringent habitat parameters than those supported by

11   both Sierra Pacific's own data and peer-reviewed studies, the HCP overestimates suitable nesting

12   habitat availability and undermines its conservation effectiveness for spotted owls.

13   Second, the amount of owl nesting habitat protected in the Potential Habitat Areas is

14   inadequate. The HCP requires only 150 acres of HF4 and 100 acres of HF4 and/or HF2H in a

15   1,000-acre Potential Habitat Area, with an additional 50 acres of contiguous forest including 30

16   acres of HF4 and 20 acres of HF2H. AR 19076–77. This falls short of scientific guidance, which

17   calls for protecting suitable habitat across both a 500-acre core use area and a total of 1,336 acres

18   within 1.3 miles of an activity center. AR 27027.

19   Finally, the Habitat Forms fail to account for essential "decadent" forest components that

20   the best available science shows are crucial for spotted owls, including deformed trees with

21   nesting features, downed logs and woody debris, hardwood presence, and multi-level forest

22   canopies. AR 41989–91. The HCP neither accounts for these components in its Habitat Forms,

23   nor includes measures to protect them during logging.

24   2.   Measure 2 Relies on Spotted Owl Surveys That Yield False Negative Results.

25   The second conservation measure, which seeks to protect habitat around known spotted

26   owl activity centers, is flawed because it allows these important protections to end after three

27   consecutive years of negative spotted owl surveys. AR 20592. This approach contradicts the best

28   available science and FWS's own guidance to determine when sites are actually abandoned.

1   Research shows that known spotted owl sites with spotted owls not detected for three

2 years can and do become recolonized if sufficient suitable habitat remains at the site. AR 64288–

3 90. For example, Dugger (2009) found that in the Tyee study area in southern Oregon, 28% of

4 historically occupied sites were recolonized after 3 or more years of nonoccupancy. AR 64287.

5 The authors observed similar recolonization rates after 3+ years of nonoccupancy in a Coast

6 Range study area (23%). *Id*. In a South Cascades study area, they found significant colonization

7 rates of 48% in areas without barred owls and 23% in areas with barred owls present. AR 64302.

8 Some sites were recolonized even after 7–8 years of nonoccupancy, and in the Coast Range and

9 Tyee study areas, recolonization was documented after more than 10 consecutive years without

10 spotted owls being detected. AR 64287. Dugger concluded: "For historically occupied sites, it's

11 probably not appropriate to ever consider a site incapable of being occupied if there have been no

12 habitat changes." AR 64287. Compounding the uncertainty around site occupancy, detection of

13 spotted owls has become increasingly because if barred owls are present, they suppress spotted

14 owl survey responses, leading to false negative results. AR 8636, 28371–75.

15   Indeed, FWS highlighted these concerns in its *Technical Assistance for Determination of*

16 *Unoccupied and Abandoned Status for Northern Spotted Owl Sites* ("Technical Assistance") to

17 the California Department of Forestry and Fire Protection ("CAL FIRE"). AR 23488–91. There,

18 FWS stated it "does not concur that the sole use of 3 years of protocol surveys is appropriate to

19 determine permanent abandonment of historic [spotted owl] sites." AR 23490. This conclusion

20 was based on both scientific research and the experience of FWS's Yreka field office, which

21 documented many cases where spotted owls reoccupied sites they had shown no sign of

22 occupancy of for more than three years. AR 28365, 28371–73. FWS's allowing known spotted

23 owl activity centers to be logged after three years of no spotted owl detection contradicts this

24 position without explanation, rendering its decision arbitrary and capricious.

25   3.  Measure 3 Fails to Minimize and Mitigate Take During Salvage Logging.

26   The record states "post-fire salvage logging negatively affects spotted owls," AR 32415,

27 but under the HCP, Sierra Pacific may salvage log burned forests with minimal restrictions. AR

28 20594. The third conservation measure addresses salvage logging, and requires habitat retention

1 areas of just 0.4 acres for every 20 acres logged, excluding areas already protected as watercourse

2 and lake protection zones. *Id*. In severely burned areas where most or all trees are killed, Sierra

3 Pacific can satisfy retention standards merely by leaving standing dead trees. *Id*. The specific

4 retention requirement in such areas is just one dead hardwood tree per 2 acres. *Id*.

5       These minimal restrictions ignore the best available science showing that spotted owls

6 continue to use and successfully nest in post-fire landscapes, even in areas with significant tree

7 mortality. AR 46668–69; AR 27228 (Clark 2007); AR 44956 (Clark 2013). Studies have

8 consistently shown spotted owls evolved with fire and can adapt to burned landscapes—

9 particularly where fires create mixed severity patterns instead of uniform high severity burns. AR

10 46668–69. Clark (2007) documented spotted owls actively selecting and using burned areas for

11 nesting, roosting, and foraging, even though they faced greater challenges in these landscapes.

12 AR 27277. While owl survival rates were lower in burned areas (0.64) compared to unburned

13 areas (1.00), and fewer owls occupied these areas overall, owls did not abandon burned

14 landscapes. AR 27309. This finding is consistent with broader research showing that owls

15 continue using burned areas for foraging and will occupy territories after fires, with outcomes

16 varying based on the patchiness of burns and, critically, post-fire management. AR 46668–69.

17       Most significantly, studies have identified "a compounding effect on occupancy of

18 salvage logging following fire in owl territories." AR 46669. Clark (2013) found extinction rates

19 increased dramatically when salvage logging was combined with high severity burns. AR 44967–

20 68. Specifically, Clark (2013) found that in areas affected by both high-severity fire and salvage

21 logging, site occupancy declined by 64% compared to only 25% in unburned landscapes during

22 the same period. AR 44956, 44963. Yet despite these best available scientific data that spotted

23 owls return to and use burned areas, and significantly impacted by post-fire salvage logging, the

24 HCP does not require any avoidance measures even if owls are found to occupy an area before

25 salvage logging begins, AR 20594, creating a risk of unaccounted and unmitigated take.

26       The third conservation measure's deficiencies are compounded by two factors. First, its

27 primary requirement—retaining green trees during salvage logging—is already mandated under

28 the State Rules. AR 16410. This means the measure provides no additional conservation benefit

1   beyond what would occur under the "no action alternative," which assumes Sierra Pacific will

2   continue logging subject only to the State Rules. AR 21701; *see Klamath-Siskiyou Wildlands Ctr.*

3   *v. Nat'l Oceanic and Atmospheric Admin.*, 99 F. Supp. 3d 1033, 1047–48 (N.D. Cal. 2015)

4   (invalidating an HCP where it relied on mitigation measures outside the permittee's control).

5   Second, while the HCP notes Sierra Pacific "voluntarily reforests timber-capable areas after

6   salvage operations," AR 20594, this is not a binding commitment under the conservation

7   measure, and therefore cannot be relied upon to minimize or mitigate take. These failures mean

8   the third conservation measure does not satisfy the ESA's requirement that an HCP minimize and

9   mitigate the impacts of take to the maximum extent practicable. 16 U.S.C. § 1539(a)(2)(B)(ii).

10   The measure neither prevents take during salvage operations nor provides meaningful mitigation

11   for such take when it occurs.

12   B.     The BiOp Unlawfully Relies on Conservation Measures to Reach No Jeopardy.

13          As noted, when FWS prepares a BiOp to evaluate whether to issue an incidental take

14   permit, it may rely on mitigation and conservation measures to find the proposed action will not

15   jeopardize the continued existence of a listed species only if such measures "constitute a 'clear,

16   definite commitment of resources,' and [are] under agency control or otherwise reasonably

17   certain to occur." *Ctr. for Biological Diversity v. Bernhardt*, 982 F.3d 723, 743 (9th Cir. 2020)

18   (citations omitted). Such measures "must be subject to deadlines or otherwise-enforceable

19   obligations; and most important, they must address the threats to the species in a way that satisfies

20   the jeopardy . . . standard[]." *Id*. (citation omitted).

21          Here, the BiOp relies on the conservation measures to find that Sierra Pacific's logging

22   covered by the permit will not jeopardize northern or California spotted owls. AR 22955–56. The

23   BiOp's reliance on three of the conservation measures is arbitrary and capricious because, as

24   noted, these measures do not adequately address the primary threats to spotted owls: the habitat

25   definitions and thresholds in measure 1 allow continued degradation of high-quality nesting

26   habitat by using parameters below minimum thresholds established by the best available science,

27   AR 34496, 35545; measure 2's survey protocol enables premature abandonment of habitat

28   protections despite known false negatives inherent in the survey protocol, AR 28375, 28371–73;

1  and measure 3 fails to protect owls from take during salvage logging operations while providing

2  no meaningful mitigation for such take. AR 20594.

3      Separately, but equally important, the conservation measures fail to "address the threats to

4  the species in a way that satisfies the jeopardy . . . standard[]." *W. Watersheds Project v. McKay*,

5  No. 22-35706, 2023 WL 7042541, at *3 (9th Cir. Oct. 26, 2023) (finding a BiOp unlawful where

6  mitigation measures failed to address harms that could occur during gaps between identifying

7  threats and implementing protective measures). The BiOp acknowledges spotted owls already

8  face significant threats from, among other things, continued habitat loss, AR 22983, but FWS

9  approves conservation measures that fail to meaningfully address the fact that it authorizes even

10 more habitat loss, in addition to what is sure to occur due to wildfire. By allowing habitat loss

11 through inadequate retention standards and premature site abandonment, the measures accelerate

12 the continued habitat loss the BiOp identifies as a primary threat. AR 20580–81.

13 C.      The BiOp Fails to Evaluate Climate Change in its Jeopardy Analysis.

14      A BiOp is arbitrary and capricious if it "entirely failed to consider an important aspect of

15 the problem[.]" *Native Fish Society v. Nat'l Marine Fisheries Servs.*, 992 F. Supp. 2d 1095, 1111

16 (D. Or. 2014) (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Ins. Co.*, 463 U.S. 29, 42

17 (1983)). "In the context of the ESA, the 'problem' is whether a proposed project will cause

18 jeopardy to a listed species[,] and 'any effect that is likely to adversely affect the species is

19 plainly an important aspect of the problem.'" *Native Fish*, 992 F. Supp. 2d at 1111 (*quoting S.*

20 *Yuba River,* 723 F. Supp. 2d at 1270). A BiOp violates the ESA if it "fail[s] to utilize the best

21 available scientific information by not addressing the . . . issue of climate change." *Nat. Res. Def.*

22 *Council v. Kempthorne*, 506 F. Supp. 2d 322, 388 (E.D. Cal. 2007). To conduct a sufficient

23 analysis regarding climate change, a BiOp must use the best scientific data to "quantitatively

24 *estimate* climate impacts," and provide "a complete, reasoned, and adequately explained" analysis

25 of how climate change will affect the species' survival and recovery. *Nat'l Wildlife Fed'n v. Nat'l*

26 *Marine Fisheries Serv.*, 184 F. Supp. 3d 861, 917, 923 (D. Or. 2016) (emphasis original).

27      Here, the body of the BiOp fails to provide any complete or reasoned explanation of how

28 climate change will affect the owls. Indeed, the BiOp uses the word "climate" only once, in a

1  paragraph stating population trends range-wide for the California spotted owl, noting generally

2  the "effects of drought and climate change" is a category of range-wide threats to the subspecies.

3  AR 22943. The failure of the BiOp to fully address this significant issue is unlawful because the

4  BiOp must contain the integration and synthesis of all factors affecting the owls, to reach a

5  complete and reasoned determination of whether they and the proposed action will jeopardize the

6  continued existence of the species. *Kempthorne*, 506 F. Supp. 2d at 370 (ruling that "the absence

7  of any discussion in the BiOp of how to deal with any climate change is a failure to analyze a

8  potentially important aspect of the problem.").

9       Attached to the BiOp as Appendix A is a document that generally discusses the status of

10  the northern spotted owl alone. AR 22971–23047. A subsection of Appendix A summarizes

11  climate change impacts to the northern spotted owl in "Pacific Northwest forests," and projects

12  "an increase in fire frequency, duration, and severity" that "is expected to double or triple" the

13  area burned annually by wildfires within 56 years. AR 22990. But even then, the subsection does

14  not focus on the northern spotted owl in California; it states that "[f]or the more central portion of

15  the northern spotted owl's range *such as the location of the action area,* climate models have

16  provided a series of projections." AR 22991 (emphasis added). Sierra Pacific's lands are not in

17  the central portion of the northern spotted owl's range, they are near the southernmost portion. 85

18  Fed. Reg. at 81,145. Next, the Appendix cites a 2016 CDFW report that only generally predicts

19  effects of climate change on northern spotted owls in California. AR 22990–91; 26748–56

20  (report). The report states "[m]ost climate projection scenarios agree" climate change will result

21  in conditions "linked to sudden large-scale mortality in avian populations" and "closely

22  associated with a decrease in northern spotted owl survival and recruitment." AR 26751.[11]

23  _____

24  [11]   Appendix A cites the CDFW report to support the assertion that "in some instances[,] predicted future conditions, such as increased frequency of low to moderate severity fires and

25  expansion of suitable owl habitat forest types, may be favorable to northern spotted owl in the long-term." AR 22991. This characterization misrepresents the report, which acknowledges some

26  fires have mixed effects, but primarily concludes climate change will harm owls through increased mortality and decreased recruitment. AR 26750–52; *cf. Pacific Coast Fed'n of*

27  *Fishermen's Ass'ns v. Nat'l Marine Fisheries Serv.*, 265 F.3d 1028, 1037 (9th Cir. 2001) (invalidating BiOp where its "optimism" about post-logging forest regrowth was "wholly

28  unrealistic").

1          In sum, Appendix A states climate change will result in conditions linked to "large-scale

2     avian mortality," but says nothing more about what that means in terms of the survival and

3     recovery of northern spotted owls in California. Moreover, Appendix A does not provide any

4     reasoned explanation about what that prediction means in the context of all of the other factors

5     significantly affecting the northern spotted owl in California, including continued logging of

6     habitat allowed under the permit, wildfires, and the incursion of barred owls. In *Wild Fish

7     Conservancy v. Irving*, 221 F. Supp. 3d 1224, 1234 (E.D. Wash. 2016), the court ruled that a

8     BiOp stating generally that "climate change is likely to warm and change the hydrology of the

9     entire critical habitat for [Upper Columbia Steelhead]" is unlawfully "conclusory and

10    unconnected to the analysis of the [project's] operations and water use." The same is true here. As

11    the Ninth Circuit has held, a BiOp considering climate change must consider and explain whether

12    diminished listed populations can "sustain" logging under the permit "on top of potential climate

13    change effects." *W. Watersheds Project v. McKay*, No. 22-35706, 2023 WL 7042541, at *2 (9th

14    Cir. Oct. 26, 2023).

15         Moreover, there is no analysis whatsoever in Appendix A as to how climate change will

16    affect the California spotted owl. The California spotted owl's Sierra Nevada habitat faces

17    different and even more severe climate-related threats than the northern spotted owl's habitat

18    across the Pit River dividing line. The granitic Sierra Nevada range has different forest types, soil

19    compositions, and precipitation patterns—AR 48702—than the northern spotted owl's range

20    across the geologically complex Klamath Mountains to the northwest, which are characterized by

21    a diverse mix of metamorphic and igneous formations, AR 42432–33, as well as the volcanic

22    Cascades to the north, AR 42429–30. *See* AR 30596 ("Ecoregions of California" map with

23    summaries). These differences make the Sierra Nevada ecosystem particularly vulnerable to

24    climate-driven megafires. AR 35547. Warming temperatures, prolonged droughts, and earlier

25    snowmelt in the Sierra Nevada are already leading to longer fire seasons and more extreme fire

26    behavior in California spotted owl habitat. AR 21830, 35547, 69734. The BiOp's failure to

27    analyze these unique threats to California spotted owl habitat is particularly arbitrary given that

28    recent research has documented accelerating rates of high-severity fire in the Sierra Nevada

1    compared to the Cascades, driven by climate change impacts that are expected to intensify over

2    the term of the permit. AR 6796–97, 31955–56, 48549.

3        These failures matter considerably because the record apart from the BiOp proves, for

4    example, that climate change is predicted to delay or preclude re-growth of forests after logging.

5    AR 22990, 48388. That calls into question—without serious treatment—the presumption that new

6    protection habitat areas will ever exist. AR 20591 (assumes the HCP will result in more

7    protection habitat areas over the 50-year term, because new suitable habitat will be created). As in

8    *National Wildlife,* the BiOp is inadequate because its "does not consider whether the effectiveness

9    of the . . . actions, designed to offset adverse effects . . . will be diminished by climate change."

10   184 F. Supp. 3d at 918.

11       Further, climate change is likely to exacerbate the risk of wildfire after the clearcut

12   logging Sierra Pacific applies across its lands, AR 7691, which is predicted to result in even more

13   extreme fire events. AR 32203, 41991. By the end of the 50-year permit term, clearcut logging

14   will result in over half of Sierra Pacific's lands being maintained as even-aged plantations, despite

15   these young, homogenous stands being particularly vulnerable to catastrophic fire. AR 22936. Of

16   Sierra Pacific's lands that actually support conifers and are available for harvest, nearly 60% will

17   be managed as these fire-prone plantations. *Id.*[12] While the BiOp refutes the HCP's erroneous

18   assertion that Sierra Pacific's even-aged management strategy may reduce the risk of fire, AR

19   22954,[13] it still fails to account for the additive risk of higher frequency and severity of

20   catastrophic wildfire events that climate change poses across the HCP area. AR 67582–83.

21       In sum, the BiOp fails to provide the "complete, reasoned, and adequately explained"

22   analysis of climate change impacts the ESA requires. *National Wildlife,* 184 F. Supp. 3d at 917. It

23   does not quantitatively estimate the effects of climate impacts where possible, analyze how

24

25   [12]   The projected 55% conversion rate from the HCP divided by the 93% of lands that support
     conifers and are available for logging (excluding 2% non-conifer and 5% non-harvestable lands,
26   AR 20574) yields approximately 59.14%.

27   [13]   The best available science proves even-aged plantations increase the rate of wildfire spread
     and have lower relative humidity and higher wind speeds than uneven-aged forests, which can
28   make them highly flammable for a decade or more following the early growth phase. AR 22954.

1   climate change will diminish the effectiveness of conservation measures, nor evaluate the

2   assertion of catastrophic effects, particularly (although not exclusively) for the California spotted

3   owl. These failures cannot be excused on the basis of uncertainty, because the ESA "does not

4   require scientific certainty," *id*. at 921, and agencies "may not ignore evidence simply because it

5   falls short of absolute scientific certainty." *Nw. Ecosystem All. v. U.S. Fish & Wildlife Serv.*, 475

6   F.3d 1136, 1147 (9th Cir. 2007). FWS's failure to provide a complete and reasoned analysis of

7   climate change in the BiOp renders it arbitrary and capricious.

8       D.      FWS Adopted an Unlawful Definition of Take.

9           As noted, if FWS concludes an action is not likely to jeopardize a listed species, it must

10   evaluate whether the action may take individual members of the species and, if so, prepare an ITS

11   prescribing the amount or extent of incidental take, reasonable and prudent measures to minimize

12   the impact of such take, and mandatory terms and conditions necessary to implement those

13   measures. 50 C.F.R. §§ 402.14(i)(1)(i)–(ii), (iv).[14] The Ninth Circuit has recognized that

14   "Congress has clearly declared a preference for expressing take [in an ITS] in numerical form" of

15   individual members of the species. *Allen*, 476 F.3d at 1037 (internal citations omitted) (citing

16   H.R. Rep. No. 97-567, at 27 (1982), *reprinted in* 1982 U.S.C.C.A.N. 2807, 2827).

17       1.      The Hexagon Tool is Unlawful as a Basis to Determine Incidental Take.

18           The ITS estimates Sierra Pacific will take 115 northern spotted owls and 649 California

19   spotted owls over the 50-year permit term by logging habitat. AR 22956–58.[15] This estimate is

20   based on the hexagon tool Sierra Pacific proposed in its HCP. *Id*. Using the hexagon tool, the ITS

21   provides one instance of take occurs when: (1) logging occurs during a five-year period in a

22   habitat hexagon occupied by spotted owls at the baseline modeling date of 2016, and (2) either

23   the logging causes the hexagon to fall "Below Threshold," or the logging occurs in a hexagon

24   already "Below Threshold" at the outset of the five-year period. *Id*.

---

25   [14]  If the required level of take is exceeded, that strongly indicates the assumptions underlying the

26   no jeopardy finding must be revisited. *Ctr. for Biological Diversity v. Salazar*, 695 F.3d 893, 912
     (9th Cir. 2012). Accordingly, an ITS must set a level of take which, if exceeded, requires

27   reinitiation of consultation. *Id.*; *accord, Allen*, 476 F.3d at 1041.

28   [15]  No "direct" take of owls is authorized. AR 22957.

1       FWS's decision to adopt the hexagon tool for allowed incidental take is arbitrary and

2  capricious for three reasons. Foremost, when incidental take occurs, additional take caused by

3  covered activities in the same hexagon over the next five years is not counted as further take,

4  irrespective of Sierra Pacific's logging or other activities there or their impact on spotted owls.

5  AR 22949. In other words, once Sierra Pacific has logged one of its hexagons to the extent it

6  results in take, nothing else the company does in that hexagon over the next five years counts as

7  additional take. This creates the perverse incentive for Sierra Pacific to log even more intensely

8  once take occurs, since any additional harm to owls during that five-year period is not counted.

9       Moreover, because the amount of take is determined by hexagon, and not how many owls

10  actually occupy the hexagon, the ITS gives Sierra Pacific the incentive to prioritize logging in

11  hexagons with higher owl populations, maximizing logging while minimizing recorded take. The

12  BiOp acknowledges that "[t]he biological reality of this accounting method means that in some

13  cases, multiple entries for harvest could occur in an occupied hexagon for up to five years in a

14  row, . . . impact[ing] reproduction in consecutive years rather than only once as was modeled."

15  AR 22949. Nonetheless, the BiOp justifies this approach as serving "to maintain consistency with

16  the modeled estimate of take and as a practical accounting matter." *Id*.

17       This approach is unlawful because omitting any subsequent take that may occur over the

18  subsequent 5-year period in a 500-acre hexagon from the incidental take determination negates

19  the "trigger function" the ITS must contain. *Allen*, 476 F.3d at 1039. In this respect, the error is

20  similar to the ITS the Ninth Circuit found unlawful in *Allen*. There, FWS set the level of

21  permissible incidental take at the same level as the proposed project (logging of 22,227 acres). *Id*.

22  at 1040. The Ninth Circuit held this approach is unlawful, reasoning that "[e]ven if the actual

23  number of takings of spotted owls that occurred during the project was considerably higher than

24  anticipated, the [ITS] would not permit the FWS to halt the project and reinitiate consultation."

25  *Id*. at 1039. Such an approach "reads out of the statute the possibility of a revived consultation,

26  rendering the monitoring and reinitiation provisions of the regulations meaningless." *Id*. at 1041.

27  Similarly, here, even if the actual number of spotted owls taken in a hexagon is far higher than

28  anticipated, the ITS does not contain a mechanism for FWS to halt logging and reinitiate

1   consultation.

2       FWS's justification for adopting this approach—"to maintain consistency with the

3   modeled estimate of take and as a practical accounting matter"—reveals its error. The purpose of

4   an ITS is not to "maintain consistency" with modeled estimates of take. Instead, the ITS must

5   establish a mechanism for checking whether the effects of the action are in fact consistent with

6   what FWS estimated in the BiOp. *Id*. at 1039. Here, FWS's approach removes that mechanism.

7   Moreover, FWS's adoption of this approach to determining take cannot be justified "as a practical

8   accounting matter" either. Nothing in the ESA permits FWS to prioritize administrative

9   convenience over ecological accuracy. *Alliance for the Wild Rockies v. Petrick*, 68 F.4th 475,

10  492–93 (9th Cir. 2023) (invalidating agency decisions that relied on factors Congress did not

11  intend for it to consider); *see Hill*, 437 U.S. at 185 ("the legislative history undergirding § 7

12  reveals an explicit congressional decision to require agencies to afford first priority to the

13  declared national policy of saving endangered species").

14          2.      <u>Surveys to Determine Spotted Owl Occupancy are Unlawfully Uncertain</u>.

15      Second, the approach FWS adopted for determining when incidental take occurs fails to

16  comply with the best available science to determine spotted owl site occupancy. There are two

17  main problems. First, because barred owls suppress spotted owl survey responses, AR 28371–73,

18  and take determinations depend on survey results showing occupancy, AR 22957, it is probable

19  that actually occupied sites will be wrongly deemed unoccupied. When Sierra Pacific then logs

20  these sites, the resulting take of spotted owls goes uncounted. Second, as noted, even where

21  barred owls do not confound survey results, sites with no detected spotted owls for three years

22  may still be reoccupied if sufficient suitable habitat remains. AR 64287–90.

23      Both problems are well-documented, and FWS recognized them in its Technical

24  Assistance to CAL FIRE. As noted, FWS cautioned against relying solely on surveyed non-

25  occupancy, and explained that spotted owl sites may be occupied but owls fail to respond to

26  survey calls, or sites may show no occupancy for more than three years but then are subsequently

27  reoccupied. AR 23397, 23488–90. In either case, logging spotted owl habitat risks uncounted

28  take. By failing to incorporate these scientific findings into its approach for determining take,

1  FWS adopted Sierra Pacific's approach that systematically undercounts actual take occurrences,

2  particularly in areas where barred owls are present, and fails to protect habitat needed for future

3  reoccupation. This undermines the ITS's effectiveness as a monitoring tool and violates the

4  ESA's requirement that FWS use the best available science. 16 U.S.C. § 1536(a)(2).

5  E.      The EIS is Unlawful Because it Contains an Improper No Action Alternative.

6          An EIS must include "the alternative of no action," which is the environmental "baseline"

7  against which action alternatives are compared. *Friends of Yosemite*, 520 F.3d at 1032, 1038.

8  "Establishing appropriate baseline conditions is critical to any NEPA analysis." *Great Basin Res.*

9  *Watch v. U.S. Bureau of Land Mgmt.*, 844 F.3d 1095, 1101 (9th Cir. 2016). Without the correct

10  baseline, "there is simply no way to determine what effect the [proposed action] will have on the

11  environment and, consequently, no way to comply with NEPA." *Id.*

12          The Ninth Circuit has relied on the CEQ guidance to interpret NEPA. *Russell County*

13  *Sportsmen v. U.S. Forest Serv.*, 668 F.3d 1037, 1045 (9th Cir. 2011). The CEQ Guidance states

14  that if the agency's "no action" choice "would result in predictable actions by others, this

15  consequence . . . should be included in the analysis." *Forty Most Asked Questions about CEQ's*

16  *National Environmental Policy Act Regulations*, 46 Fed. Reg. 18,026, 18,027 (March 23, 1981).[16]

17  The Guidance states as an example that, if denying "permission to build a railroad to a facility

18  would lead to construction of a road and increased truck traffic, the EIS should analyze the

19  consequence of the 'no action' alternative." *Id*. at 18,027.

20          Here, FWS defines no action as choosing not to issue the take permit. AR 21701. FWS

21  assumes that choice would mean Sierra Pacific would continue to log its lands under "current

22  management practices" including the State Rules, with "[n]o additional conservation measures,"

23  *id*., and none of the conservation measures Sierra Pacific implemented over the preceding 10

24  years leading up to the HCP. AR 23086. According to the EIS, this alternative "presents a way to

25  legally harvest timber without issuance of an ITP by the Service (i.e., this alternative avoids

26  _____

27  [16]   Other district courts have adopted a similar approach to no action. *See*, *e.g.*, *Hammond v.*
*Norton*, 370 F. Supp. 2d 226, 241 (D.D.C. 2005) (upholding no action analysis that realistically

28  assessed consequences of denying an oil pipeline permit, namely, alternative fuel transportation
methods would be used to meet demand for diesel and gas).

1  incidental "take" of listed species)." AR 21701. Yet FWS also concluded that issuing the permit

2  would result in take of as many as 115 northern spotted owls and 649 California spotted owls

3  over the next 50 years. AR 22931. Nevertheless, FWS found issuing the permit would have

4  "[b]eneficial effects compared to the No Action Alternative because of the implementation of the

5  conservation measures" in the HCP. AR 21714.

6       The no action alternative in the EIS is unlawful for three reasons. Foremost, the permit is

7  what allows Sierra Pacific to legally take spotted owls; without it, any take is prohibited. Sierra

8  Pacific "maintains a database of the locations of all [activity centers] on or within" 1.3 miles for

9  northern spotted owls and 1 mile for California spotted owls. AR 22957. Any logging without a

10 federal incidental take permit in northern spotted owl activity centers—and California spotted owl

11 activity centers if listed—would expose Sierra Pacific to civil and criminal liability. *Bennett v.*

12 *Spear*, 520 U.S. 154, 170 (1997) ("any person" who "knowingly takes" a listed species is subject

13 to "substantial" penalties). Indeed, this liability risk is presumably why Sierra Pacific sought the

14 permit in the first place. But if in fact FWS took "no action" on the permit, Sierra Pacific would

15 predictably avoid liability and not log at least northern spotted owl habitat. Accordingly, the

16 "effects" of a correct no action alternative—and the proper basis to gauge the effects of not

17 issuing the permit—is existing spotted owl habitat is retained, and not logged. Sierra Pacific's

18 own comments on the draft EIS confirm it would modify its logging to avoid take liability, stating

19 that "if an [incidental take permit] is not issued, current forest and timber management practices

20 are unlikely to continue[.]" AR 21701; 23379–82.[17]

21      Second, the fact that in the no action alternative, FWS assumed Sierra Pacific would

22

23  [17]   Sierra Pacific also commented it might not "allow large tree owl nesting and support habitat
        (HF4 and HF2H) that are unoccupied to develop and persist on its lands" because "such habitat
24      could attract owls, which would mean that much of it could no longer be harvested." AR 23380.
        "In this scenario, timberlands meeting HF4 and HF2H standards that were otherwise available for
25      harvest would become economic liabilities or stranded assets for [Sierra Pacific]." *Id*. Sierra
        Pacific further asserted that "the 'no action' alternative might "predictabl[y]" lead it to "reduce
26      existing unoccupied HF4 and HF2H stands to HF2 and harvest frequently enough to prevent
        suitable habitat from developing through regrowth." *Id*. As FWS correctly concluded, such a
27      change to Sierra Pacific's operations is speculative and should not be considered part of the no
        action alternative. AR 21752.
28

1  simply continue logging under the State Rules and other guidance contradicts its own findings as

2  to the inadequacy of these mechanisms to prevent the listing and proposed listing of both

3  subspecies of owls. Sierra Pacific has logged northern and California spotted owl habitat in

4  California under "current management practices"—meaning mostly state laws—for decades. AR

5  21681, 20575. But when FWS recently found that the northern spotted owl "meets the definition

6  of an endangered species," and proposed to list the California spotted owl as threatened with

7  extinction, FWS found "existing regulatory mechanisms," including state laws, inadequate to

8  address threats to both subspecies. 85 Fed. Reg. at 81,145-46 (northern spotted owl); 88 Fed. Reg.

9  at 11,608 (California spotted owl). Having found these laws are inadequate to protect the species,

10  FWS cannot maintain they somehow avoid incidental take.

11         Third, FWS's reason for omitting conservation measures Sierra Pacific was implementing

12  for the preceding ten years from the no action alternative is arbitrary and capricious. FWS

13  dismissed these existing conservation measures from the baseline because they were "conducted

14  in part as a precursor to the HCP." AR 23086. But these conservation measures form Sierra

15  Pacific's "current forest and timber management practices," and following FWS's rationale for

16  not considering management changes Sierra Pacific asserted may result if the permit did not

17  issue, FWS "cannot reliably predict future management changes." AR 21701. This manipulation

18  of the baseline analysis mirrors *Ctr. for Biological Diversity v. U.S. Bureau of Land Mgmt.*, where

19  BLM improperly included protective "interim closures" in its preferred alternative while

20  excluding them from the no action alternative. 422 F. Supp. 2d 1115, 1161–62 (N.D. Cal. 2006).

21  There, the court held this violated NEPA's requirement to "present complete and accurate

22  information to decision makers and to the public to allow an informed comparison of the

23  alternatives." *Id*. By excluding interim closures from the no action alternative, "BLM was able to

24  conclude (and represent to the public) that [its preferred alternative] provided greater protection

25  for special status species and their habitat" when in reality it provided less protection compared to

26  the actual status quo. *Id*. Here, similarly, by excluding Sierra Pacific's existing conservation

27  measures from the baseline while including them in the proposed action, FWS creates the false

28  impression that issuing the permit provides greater environmental benefits than it does.

1    FWS's wrongful characterization in the EIS of the environmental baseline matters because

2    it obscures the trade-offs at stake. The EIS fails to quantify and disclose the habitat that would be

3    protected under the ESA's take prohibition. For example, the EIS acknowledges that 161,656

4    acres would need to be retained around the 121 northern spotted owl activity centers detected on

5    Sierra Pacific's lands in surveys conducted in 2016, but fails to disclose how many of those acres

6    are covered by the HCP. AR 21701. It does not even address how many acres would need to be

7    retained around the 688 California spotted owl activity centers if it is listed during the permit term

8    as FWS has proposed. AR 21702. Worse, when comparing the proposed action to no action,

9    protections around activity centers sufficient to avoid take are not reflected at all. *See* AR 21715–

10   16. The EIS assumes the proposed action would increase northern spotted owl potential habitat by

11   approximately 199,000 acres, and California spotted owl potential habitat by approximately

12   347,000 acres by the end of the permit term in 2066 compared to 2016, but it does not disclose,

13   much less compare, how many acres of potential habitat could accrue by then if Sierra Pacific

14   avoided take by avoiding logging in existing potential habitat areas for the 50-year permit term.

15   AR 21715–16. On the other hand, the EIS credits the HCP with creating "Protection Zones"

16   around all known and newly discovered spotted owl yearly activity centers without

17   acknowledging that Sierra Pacific would avoid logging these same areas in order to avoid Section

18   9 liability without permit. AR 21704.

19       By defining the baseline as Sierra Pacific's past practices at their most harmful, while

20   ignoring both legal constraints and the company's own statements about future behavior, FWS

21   manufactured a comparison that artificially elevated the environmental benefits of issuing the

22   permit. *Pacific Coast Fed'n of Fishermen's Ass'ns v. U.S. Dept. of Interior*, 655 Fed. Appx. 595,

23   598 (9th Cir. 2016) (no action alternative unlawful where it assumes continued water delivery

24   under the contract up for renewal); *Nat. Resources Def. Council v. U.S. Forest Serv.*, 421 F.3d

25   797, 811 (9th Cir. 2005) ("Inaccurate information may defeat the purpose of an EIS by impairing

26   the agency's consideration of the adverse environmental effects and the informed comparison of

27   alternatives."). This error leads the EIS to mischaracterize ESA compliance as conservation

28   benefits: it presents the HCP's Protection Zones around activity centers as providing greater

1    protection than no action, AR 21703–04, when these zones should be protected regardless under

2    the ESA's take prohibition. This mirrors the baseline manipulation rejected in *Ctr. for Biological*

3    *Diversity*, where the agency improperly excluded existing protections from its baseline analysis.

4    422 F. Supp. 2d at 1162–63.

5    F.    The Court Should Vacate FWS's Unlawful Actions.

6         The Ninth Circuit has held that under the APA, "the normal remedy for an unlawful

7    agency action is to 'set aside' the action. In other words, a court should vacate the agency's action

8    and remand to the agency to act in compliance with its statutory obligations." *Se. Alaska*

9    *Conservation Council v. U.S. Army Corps of Eng'rs*, 486 F.3d 638, 654 (9th Cir. 2007) (internal

10   quotation marks and citation omitted), *rev'd on other grounds sub nom. Coeur Alaska v. Se.*

11   *Alaska Conservation Council*, 557 U.S. 261 (2009). The Ninth Circuit has held that courts depart

12   from this remedy only in "rare circumstances," *Or. Nat. Desert Ass'n v. Jewell*, 840 F.3d 562, 575

13   (9th Cir. 2016), and "when equity demands" a departure. *Pollinator Stewardship Council v. EPA*,

14   806 F.3d 520, 532 (9th Cir. 2015).

15        Here, no equitable reasons exist to depart from the ordinary remedy and not vacate FWS's

16   decisions to approve the HCP, issue the incidental take permit, and issue the EIS and Record of

17   Decision. These decisions are all unlawful, and collectively they allow further take of ESA-listed

18   subspecies FWS itself has found are literally at the brink of extinction. 85 Fed. Reg. at 81,144

19   (endangered status warranted for northern spotted owl); 85 Fed. Reg. at 81,145 (northern spotted

20   owl decline rate "has increased noticeably" since most recent 5-year status review); 88 Fed. Reg.

21   at 11,600 (California spotted owl Sierra Nevada DPS "likely to become in danger of extinction

22   within the foreseeable future"); AR 87 (documenting recent California spotted owl population

23   declines of 11% in the Lassen and 21% in the Sierra National Forests, respectively). And a

24   primary factor contributing to the dire status of these subspecies is continued logging of their

25   habitat, 85 Fed. Reg. at 81,144, which is exactly what the incidental take permit allows.

26                                          Conclusion.

27        The Court should grant EPIC's motion for summary judgment and vacate FWS's actions.

28        Date:  December 2, 2024.            Respectfully submitted,

/s/ Sangye Ince-Johannsen
Sangye Ince-Johannsen, *pro hac vice*
Peter M. K. Frost, *pro hac vice*
Western Environmental Law Center
120 Shelton McMurphey Boulevard, Suite 340
Eugene, Oregon 97401
(541) 778-6626
sangyeij@westernlaw.org

/s/ Thomas E. Wheeler
Thomas E. Wheeler (CA Bar #304191)
Environmental Protection Information Center
145 G Street #A
Arcata, CA 95521
Tel: (707) 822-7711
tom@wildcalifornia.org

Attorneys for Plaintiffs