NAVI SINGH DHILLON (SBN 279537)
navidhillon@paulhastings.com
CHRISTOPHER J. CARR (SBN 184076)
chriscarr@paulhastings.com
LUCAS V. GRUNBAUM (SBN 314180)
lucasgrunbaum@paulhastings.com
GRAYSON A. PETERS (SBN 359997)
graysonpeters@paulhastings.com
PAUL HASTINGS LLP
101 California Street, 48th Floor
San Francisco, California 94111
Telephone: (415) 856-7000

Attorneys for Defendant-Intervenor
SIERRA PACIFIC INDUSTRIES

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ENVIRONMENTAL PROTECTION INFORMATION CENTER,<br><br>Plaintiff,<br><br>v.<br><br>UNITED STATES FISH AND WILDLIFE SERVICE,<br><br>Defendant. | Case No. 2:23-cv-02611-TLN-CSK<br><br>**SIERRA PACIFIC INDUSTRIES' NOTICE OF CROSS MOTION FOR SUMMARY JUDGMENT, MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF CROSS-MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO EPIC'S MOTION FOR SUMMARY JUDGMENT**<br><br>Date:        August 7, 2025<br>Time:        2:00 p.m.<br>Judge:       Hon. Troy L. Nunley<br>Courtroom:  2 |

PLEASE TAKE NOTICE THAT on August 7, 2025 at 2:00 pm at the Sacramento Courthouse, 501 I Street, California in Courtroom 2, before the Honorable Troy L. Nunley, United States District Judge for the Eastern District of California, Defendant-Intervenor Sierra Pacific Industries will cross-move and hereby does cross-move for summary judgment under Rule 56 of the Federal Rules of Civil Procedure against Plaintiff Environmental Protection Information Center on all claims for relief in Plaintiff's Complaint for Declaratory and Injunctive Relief filed on November 9, 2023. ECF No. 1. This Cross-Motion is based on the accompanying Memorandum, the administrative record, and all argument or evidence that may be presented to, or at, any hearing on this Cross-Motion. For the reasons provided in the accompanying Memorandum, Defendant-Intervenor respectfully requests that the Court grant its cross-motion for summary judgment, deny Plaintiff's motion for summary judgment, and dismiss Plaintiff's Complaint with prejudice.

Respectfully submitted,

DATED: April 16, 2025

PAUL HASTINGS LLP

By:   /s/ Christopher Carr
CHRISTOPHER J. CARR
Attorneys for Defendant-Intervenor
SIERRA PACIFIC INDUSTRIES

SPI'S MPA ISO MOTION FOR SUMMARY JUDGMENT

Case No. 2:23-cv-02611-TLN-CSK

1

## TABLE OF CONTENTS

2
Page

3

INTRODUCTION ......................................................................................................1

4

LEGAL BACKGROUND...........................................................................................3

5

6
   A.   Endangered Species Act and National Environmental Policy Act........................3

7
   B.   Z'Berg-Nejedly Forest Practice Act and Rules ................................4

8

FACTUAL AND PROCEDURAL BACKGROUND ....................................................5

9

10
   A.   The HCP Is a Product of Extensive Multi-Agency Input
      and Collaboration ..............................................................................5

11
   B.   The HCP Reflects the Evolving Science of Spotted Owl Ecology ....................7

12
   C.   The HCP's Conservation Measures Protect SO ............................10

13

14
      1.   CM 1 Increases the Amount of SO Habitat ................................11

15
      2.   CM 2 Restricts Timber Harvesting Within Activity Centers
          and Surrounding Habitat ................................................................12

16

17
      3.   CM 3 Restricts Post-Fire Salvage Logging to Protect SO
          and Their Habitat ..........................................................................13

18
      4.   CM 4 Mitigates Catastrophic Wildfire Risk ................................13

19

20
      5.   CM 5 Protects Reproductive Sites (Occupied Activity Centers)
          from Harvest.................................................................................15

21
      6.   CM 6 Reduces Threats from Illegal Activities ............................15

22
      7.   CM 7 Retains Habitat Features in Future Timber Harvests..................15

23
      8.   CM 8 Addresses the BO Invasion...................................16

24

25
   D.   Every Agency Involved Signed Off on the HCP ..........................16

26
   E.   Take in the Form of Habitat Modification Is Measured in Hexagons..............17

27
   F.   The HCP Far Exceeds What State Law Would Otherwise Require.................17

28

STANDARD OF REVIEW........................................................................19

- iii -

1

ARGUMENT ............................................................................................................. 20

2

A.    EPIC's Claims Should Be Dismissed for Lack of Standing ............................... 20

3

B.    The HCP's Conservation Measures Minimize and Mitigate

4

the Impacts of Take to the Maximum Extent Practicable ................................. 21

5

1.    CM 1 Applies the Best Available Science by Providing Habitat

6

that Supports the SO's Full Life Cycle ........................................................ 23

7

2.    EPIC Misunderstands CM 2, Which Strictly Protects Occupied

SO Sites from Logging ............................................................................ 26

8

3.    EPIC Misreads CM 3, Which Protects Current and Future SO

9

Habitat During Salvage Harvest ................................................................ 27

10

C.    The BiOp Appropriately Analyzes How the CMs Address Threats

11

to SO ......................................................................................................... 28

12

D.    The BiOp Properly Evaluates Climate Change in Its Jeopardy

13

Analysis ..................................................................................................... 29

14

1.    The BiOp's Discussion of Climate Change Threats to SO Is Adequate ........ 30

15

2.    The BiOp's Discussion of the Effects of Climate Change

on the HCP and Its CMs Is Adequate ...................................................... 31

16

E.    The Service's Take Calculation Methodology Is Lawful ................................... 32

17

1.    The Hexagon Tool Is a Proper Method To Determine Incidental Take ......... 32

18

2.    The HCP's State-of-the-Art Survey Protocols Are Highly Accurate ............ 33

19

F.    The EIS Properly Defined and Evaluated the No Action Alternative ................. 34

20

CONCLUSION ........................................................................................................ 35

21

22

23

24

25

26

27

28

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Am. Bioscience, Inc. v. Thompson*,
   269 F.3d 1077 (D.C. Cir. 2001) ............................................................................................19

*Arizona Cattle Growers' Ass'n v. Salazar*,
   606 F.3d 1160 (9th Cir. 2010) ......................................................................................27, 34

*Baltimore Gas and Elec. Co. v. Nat'l Res. Def. Council, Inc.*,
   462 U.S. 87 (1983) ..............................................................................................................19

*Bureau of Ind. Affs. v. FLRA*,
   887 F.2d 172 (9th Cir. 1989) ..............................................................................................19

*City & County of San Francisco v. U.S.*,
   130 F.3d 873 (9th Cir. 1997) ........................................................................................19, 20

*Conservation Cong. v. Finley*,
   No. 11-4752-SC, 2012 WL 2989133 (N.D. Cal. June 28, 2012) ....................................2, 20

*Conservation Northwest v. Rey*,
   2008 WL 4485394 (W.D. Wash.) .........................................................................................2

*Ctr. for Bio. Diversity v. U.S. Dept. of Int.*,
   623 F.3d 633 (9th Cir. 2010) ..............................................................................................34

*Ctr. for Biological Diversity v. Bernhardt*,
   982 F.3d 723 (9th Cir. 2020) ........................................................................................28, 29

*Ctr. for Biological Diversity v. U.S. Bureau of Land Mgmt.*,
   698 F.3d 1101 (9th Cir. 2012) ............................................................................................28

*Ecology Ctr. v. Castaneda*,
   574 F.3d 652 (9th Cir. 2009) ..............................................................................................19

*Env't Prot. Info. Ctr. v. Cal. Dep't of Forestry & Fire Prot.*,
   44 Cal.4th 459 (2008) ...........................................................................................................4

*Env't Prot. Info. Ctr. v. Dep't of Fish & Wildlife*,
   No. A163051, 2024 WL 295704 (Cal. Ct. App. Jan. 26, 2024) ........................................1, 2

*Forest Guards. v. U.S. Forest Serv.*
   329 F.3d 1089 (9th Cir. 2003) ............................................................................................19

*Friends of the Earth, Inc. v. Laidlaw Env. Servs. (TOC) Inc.*,
   528 U.S. 167 (2000) ............................................................................................................20

    

*Friends of Endangered Species v. Jantzen,*
  596 F. Supp. 518 (N.D. Cal. 1984)..................................................................3

*Friends of Gualala River v. Gualala Redwood Timber,*
  522 F.Supp.3d 924 (N.D. Cal. 2021)...............................................................4

*Habeas Corpus Res. Ctr. v. U.S. Dep't of Just.,*
  816 F.3d 1241 (9th Cir. 2016)........................................................................20

*Loggerhead Turtle v. Cnty. Council of Volusia Cnty., Fla.,*
  120 F. Supp. 2d 1005 (M.D. Fla. 2000)........................................................3, 4

*Marsh v. Oregon Natural Resources Council,*
  490 U.S. 360 (1989)..................................................................................23, 24

*N. Plains Res. Council v. U.S. Army Corps of Eng'rs,*
  460 F.Supp.3d 1030 (D. Mo. 2020)...............................................................35

*Nat. Res. Def. Council v. Kempthorne,*
  506 F. Supp. 2d 322 (E.D. Cal. 2007) .............................................................3

*Nat'l Res. Def. Council v. Kempthorne,*
  539 F.Supp.2d 1155 (E.D. Cal. 2008) .............................................................3

*Nat'l Wildlife Fed'n v. Norton,*
  306 F. Supp. 2d 920 (E.D. Cal. 2004) ...........................................................23

*Occidental Eng'g Co. v. INS,*
  753 F.2d 766 (9th Cir. 1985) ...................................................................19, 20

*Oregon Natural Resources v. Allen,*
  476 F.3d 1031 (9th Cir. 2007)........................................................................33

*Oregon-California Trails Ass'n v. Walsh,*
  467 F.Supp.3d 1007 (D. Colo. 2020) .....................................................3, 21, 22

*Pac. Coast Fed'n of Fishermen's Ass'ns v. Blank,*
  693 F.3d 1084 (9th Cir. 2012).........................................................................19

*Salmon Spawning and Recovery Alliance v. Gutierrez,*
  545 F.3d 1220 (9th Cir. 2008).........................................................................21

*San Luis & Delta-Mendota Water Auth. v. Locke,*
  776 F.3d 971 (9th Cir. 2014) ...............................................................23, 24, 25

*Union Neighbors United, Inc. v. Jewell,*
  831 F.3d 564 (D.C. Cir. 2016) .................................................................21, 22

*W. Watersheds Project v. McKay,*
  No. 22-35706, 2023 WL 7042541 (9th Cir. Oct. 26, 2023)............................29

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**Statutes**

5 U.S.C. § 706(2)(A) ...................................................................................................... 19

16 U.S.C. § 1536(a)(2) ..................................................................................................... 3

16 U.S.C. § 1539(a)(2)(B) ......................................................................................... 3, 22

Cal. Fish & Game Code § 3503.5 .................................................................................. 28

Cal. Fish & Game Code § 2080 ....................................................................................... 6

Cal. Fish & Game Code § 2080.1 .............................................................................. 6, 24

Cal. Fish & Game Code § 2081 ....................................................................................... 6

Cal. Fish & Game Code § 2081(b)(2) ............................................................................ 24

Cal. Pub. Res. Code § 4511 ............................................................................................. 4

Cal. Pub. Res. Code § 4581 ............................................................................................. 4

Cal. Pub. Res. Code § 4582 ............................................................................................. 4

Cal. Pub. Res. Code § 4582.6 .......................................................................................... 5

Cal. Pub. Res. Code § 4582.7 .......................................................................................... 5

Cal. Pub. Res. Code § 4583.5 .......................................................................................... 4

**Regulations**

43 Code of Federal Regulations § 46.30 ........................................................................ 34

46 Fed. Reg. 18026 ........................................................................................................ 35

46 Fed. Reg. 18027 ........................................................................................................ 35

55 Fed. Reg. 26114 .......................................................................................................... 5

68 Fed. Reg. 7580 .......................................................................................................... 30

84 Fed. Reg. 60371 .......................................................................................................... 5

88 Fed. Reg. 11600 .......................................................................................................... 5

14 Cal. Code Reg. § 895 .................................................................................................. 4

14 Cal. Code Reg. § 898.2(d) .......................................................................................... 5

14 Cal. Code Reg. § 912.7 ............................................................................................. 28

14 Cal. Code Reg. § 932.7 ............................................................................................... 28

14 Cal. Code Reg. § 939.2 ............................................................................... 18, 26, 28

14 Cal. Code Reg. § 939.9 .......................................................................................... 5, 18

14 Cal. Code Reg. § 939.10 ....................................................................................... 5, 18

14 Cal. Code Reg. § 959.2 ............................................................................................... 28

14 Cal. Code Reg. § 1037 ............................................................................................. 4, 5

14 Cal. Code Reg. § 1037.1 ............................................................................................... 5

14 Cal. Code Reg. § 1037.5 ............................................................................................... 5

14 Cal. Code Reg. § 1037.8 ............................................................................................... 5

14 Cal. Code Reg. § 1037.11 ............................................................................................. 4

14 Cal. Code Reg. § 1056 .................................................................................................. 5

14 Cal. Code Reg. § 1056.6 ............................................................................................... 5

14 Cal. Code Reg. § 15251(a) ........................................................................................... 4

**TABLE OF ACRONYMS**

| AC | Activity Center |
|---|---|
| APA | Administrative Procedure Act |
| BiOp | Biological Opinion |
| BO | Barred Owl |
| CAL FIRE | California Department of Forestry and Fire Protection |
| CDFW | California Department of Fish and Wildlife |
| CESA | California Endangered Species Act |
| CEQA | California Environmental Quality Act |
| CM 1 | Conservation Measure 1 |
| CM 2 | Conservation Measure 2 |
| CM 3 | Conservation Measure 3 |
| CM 4 | Conservation Measure 4 |
| CM 5 | Conservation Measure 5 |
| CM 6 | Conservation Measure 6 |
| CM 7 | Conservation Measure 7 |
| CM 8 | Conservation Measure 8 |
| CSO | California Spotted Owl |
| DEIS | Draft Environmental Impact Statement |
| EIS | Environmental Impact Statement |
| EPIC | Environmental Protection Information Center |
| ESA | Endangered Species Act |
| FEIS | Final Environmental Impact Statement |
| FPA | California Forest Practice Act |
| FPRs | California Forest Practice Rules |
| GNN | Gradient Nearest Neighbor |
| HCP | Habitat Conservation Plan |

SPI'S MPA ISO MOTION FOR SUMMARY JUDGMENT

Case No. 2:23-cv-02611-TLN-CSK

| HF4 | Habitat Form 4 |
|-----|----------------|
| HF2H | Habitat Form 2 Heavy |
| HF2L | Habitat Form 2 Low |
| HF1 | Habitat Form 1 |
| ITP | Incidental Take Permit |
| NEPA | National Environmental Policy Act |
| NSO | Northern Spotted Owl |
| PHA | Potential Habitat Area |
| PZ | Protection Zone |
| RoD | Record of Decision |
| SO | Spotted Owl |
| SPI | Sierra Pacific Industries |
| THP | Timber Harvest Plan |
| USFS | U.S. Forest Service |
| YAC | Yearly Activity Center |

SPI'S MPA ISO MOTION FOR SUMMARY JUDGMENT    Case No. 2:23-cv-02611-TLN-CSK

**INTRODUCTION**

This lawsuit challenges the U.S. Fish and Wildlife Service's (Service) approval of Sierra Pacific Industries' (SPI) Habitat Conservation Plan (HCP) and issuance of the associated Incidental Take Permit (ITP) for Northern Spotted Owl (NSO) and California Spotted Owl (CSO) on SPI's timberlands. The HCP requires, among other things, that SPI modify its timber harvesting practices to provide improved nesting, roosting, and foraging habitat for NSO and CSO (together, spotted owls or SO). The HCP also addresses what are now the primary threats to the owls: (1) the invasion by Barred Owls (BO) (which are displacing spotted owls from their habitats); and (2) the risk of catastrophic wildfire (which is burning spotted owl habitat). Under the HCP, SPI will remove BO so SO can return to their nests and repopulate the region. When it comes to wildfire, SPI will build out a system of "fuel breaks" (which provide safe locations for firefighting) while continuing to practice even-aged management (which slows the spread of fire). This is precisely the sort of private-public partnership to benefit species that Congress envisioned when it authorized the Service to enter into HCPs and issue incidental take permits.

The Service and SPI began to develop the HCP in 2013, and the California Department of Fish and Wildlife (CDFW) and the U.S. Forest Service (USFS) joined in that effort to ensure a robust and thorough analysis. More than half a decade of collaboration culminated in the Service's approval of the HCP in 2020. Coming on the heels of that approval, CDFW issued a Consistency Determination that the HCP would satisfy the requirements of the California Endangered Species Act (CESA). All SPI timber harvesting plans (THPs) must comply with the HCP before they can be approved by the California Department of Forestry and Fire Protection (CAL FIRE), the state agency responsible for regulating timber harvesting on private lands in California.

EPIC is prosecuting this lawsuit for one reason: because timber harvesting under the HCP will include "even-aged" management, aka "clear cutting."[1] Over decades, in both lawsuits and

---

[1] EPIC has long opposed even-aged management. *See, e.g.,* Environmental Protection Information Center, *BREAKING: EPIC Moves to Ban Clearcutting in Humboldt!* (Nov. 15, 2017), https://www.wildcalifornia.org/post/breaking-epic-moves-to-ban-clearcutting-in-humboldt. EPIC's most recent litigation challenging even-aged management was rejected by the California courts. *Env't Prot. Info. Ctr. v. Dep't of Fish & Wildlife*, No. A163051, 2024 WL 295704 (Cal. Ct.

public comments on proposed timber harvesting, EPIC has continued to insist that spotted owls require substantial tracts of continuous "mature and old growth" habitat to survive.[2] It has done so notwithstanding the evolving scientific understanding of spotted owl habitat needs to the contrary. EPIC sounds the same theme in this lawsuit, alleging that the HCP does not sufficiently limit SPI's harvesting of older trees.

At the same time, EPIC does not mention (let alone fault) the HCP's BO removal and study program. EPIC has, in fact, long called for and supported actions to arrest the barred owl invasion.[3] In its 2019 comment letter on the Draft Environmental Impact Statement for the HCP, EPIC described the "experimental removal, collection, and study of barred owls" as "a keystone piece" of the HCP. AR 23389. And in 2022, EPIC commented favorably on the Service's proposed Barred Owl Management Strategy, writing it "support[s] robust barred owl removal as a strategy to benefit . . . the northern spotted owl and the California spotted owl[.]" Carr Decl., Ex. A at 1. Indeed, earlier this year EPIC intervened in two lawsuits to defend that same Barred Owl Management Strategy against challenges by animal rights groups in Washington and Oregon. *See* Carr Decl., Ex. D at 3 ("barred owl management [is] a necessary measure to stop the extinction of the" NSO); *id.* at Ex. F (granting intervention); *id.* at Ex. E; *id.* at Ex. G (granting intervention). As explained below, not only do the Annual Reports required by the HCP show that its BO removal and study program (Conservation Measure (CM) 8) is working as planned, but that the removal of BO will more than fully offset all incidental take, AR 19181. It is telling that EPIC fastidiously refuses to even mention CM 8 in this litigation, particularly as its enormous benefits are dispositive to many of EPIC's claims.

As detailed below, the HCP is based on decades of scientific research and years of close collaboration between the Service's experts and SPI. It also reflects years of sustained input from

---

App. Jan. 26, 2024) (rejecting EPIC's challenge to a conservation agreement between Green Diamond Resource Company and CDFW for the Humboldt marten).

[2] *See, e.g., Conservation Northwest v. Rey,* 2008 WL 4485394 (W.D. Wash.) (EPIC describing NSO as a species that "depend[s] on mature and old growth forests").

[3] In prior SO suits, EPIC alleged failures to address the BO threat. *See Env't Prot. Info. Ctr. v. U.S. Forest Serv.*, 2004 WL 2336207, at *29-30; *Conservation Cong. v. Finley*, No. 11-4752-SC, 2012 WL 2989133, at *14.

SPI'S MPA ISO MOTION FOR SUMMARY JUDGMENT                    Case No. 2:23-cv-02611-TLN-CSK

1    USFS and CDFW experts, with each agency concluding that the HCP would provide necessary

2    protections and benefits for the SO.  This Court should reject EPIC's claims.

3                                    **LEGAL BACKGROUND**

4    **A.    Endangered Species Act and National Environmental Policy Act**

5             Because the Service's brief summarized the relevant sections of the ESA (sections 7, 9, and

6    10), its implementing regulations ("harm" definition and consultation regulations), as well as NEPA

7    (*see* ECF No. 45 at 2-5), we will not further explain them here other than to emphasize two points:

8             First, Congress intended the Service to foster long-term Habitat Conservation Plans under

9    its Section 10 incidental take permitting authority: "To the maximum extent possible, the Secretary

10   should utilize this authority under this provision to encourage creative partnerships between the

11   public and private sectors and among government agencies in the interest of species and habitat

12   conservation[.]"  H.R. Conf. Rep. No. 97-835 at 30-31 (1982).  Bottom line: the HCP and ITP

13   process incentivizes private landowners to manage their land and take actions for the conservation

14   of the species that go above and beyond legal requirements.  *See Friends of Endangered Species v.*

15   *Jantzen*, 596 F. Supp. 518, 527 (N.D. Cal. 1984) (Congress intended to "encourage private

16   participation in the conservation process[.]").

17            Second, it is hornbook law that both biological opinions (BiOps) and ITPs must be based

18   on the best available science.  *See* 16 U.S.C. § 1536(a)(2) (requiring use of "the best scientific and

19   commercial data available"); Carr Decl., Ex. C at xi, xxi, 1-2, 1-6, 1-7, E-7; AR 41647, 41665

20   (2016 HCP and ITP Processing Handbook); *Nat. Res. Def. Council v. Kempthorne*, 506 F. Supp.

21   2d 322, 348, 359-367 (E.D. Cal. 2007) (applying "best available science" standard to BiOp

22   challenge); *Oregon-California Trails Ass'n v. Walsh*, 467 F.Supp.3d 1007, 1037 (D. Colo. 2020)

23   (applying "best available science" standard to ITP challenge).  And precisely because the Service

24   employs its substantial scientific expertise in the consultation and ITP processes, BiOps and ITPs

25   are entitled to substantial deference.  *See Nat'l Res. Def. Council v. Kempthorne*, 539 F.Supp.2d

26   1155, 1170 (E.D. Cal. 2008) (explaining section 7 consultation process and noting that "biological

27   opinions . . . are entitled to great deference"); *Loggerhead Turtle v. Cnty. Council of Volusia Cnty.,*

28

                                            - 3 -

1    *Fla.*, 120 F. Supp. 2d 1005, 1022 (M.D. Fla. 2000) ("The Service's selection" of minimization and

2    mitigation measures in an ITP "is entitled to deference due to its biological expertise.").

3        **B.    Z'Berg-Nejedly Forest Practice Act and Rules**

4        California's Forest Practice Act (FPA) establishes a comprehensive system for regulating

5    timber harvesting on private lands through THPs.  Cal. Pub. Res. Code (PRC) § 4511, *et seq*.

6    Implementing regulations, the Forest Practice Rules (FPRs), are adopted by the California State

7    Board of Forestry and Fire Protection and administered by the California Department of Forestry

8    and Fire Protection (CAL FIRE).  14 Cal. Code Regs. (CCR) § 895, *et seq*.  The 2020 FPRs, in

9    effect when the HCP was approved and the ITP issued, span over 400 pages.  AR 16153-583.

10        In addition to compliance with the FPA and the highly prescriptive FPRs, every THP is

11    subject to the California Environmental Quality Act (CEQA), a law notorious for the costly and

12    time-consuming environmental review process it requires.  Because the multi-agency, inter-

13    disciplinary process for the review and approval of THPs, explained below, is so robust, it has been

14    certified by California's Resources Secretary "as the functional equivalent to, and hence an

15    adequate substitute for, the full environmental impact report (EIR) process required by CEQA."

16    *Env't Prot. Info. Ctr. v. Cal. Dep't of Forestry & Fire Prot.*, 44 Cal.4th 459, 491 (2008); 14 CCR

17    § 15251(a); *see, e.g.*, Carr Decl., Ex. H (THP No. 2-24-00195-TRI ("Cedar King")).  Given this

18    process, it is not surprising that SPI's THPs have withstood CEQA challenges intended to prevent

19    timber harvesting.  *See, e.g.*, *Battle Creek All. v. Dep't of Forestry & Fire Prot.,* No. C095091,

20    2023 WL 2362253 (Cal. Ct. App. Mar. 6, 2023).

21        "Before any trees can be cut, [the FPA and FPRs] require the preparation of a [THP] by a

22    professional forester."  *Friends of Gualala River v. Gualala Redwood Timber*, 522 F.Supp.3d 924,

23    929 (N.D. Cal. 2021) (citing FPA and FPRs.)  "The THP must be submitted to [CAL FIRE] for

24    review, public comment, and approval."  *Id* (citing PRC §§ 4581-82.)  CAL FIRE then works with

25    the applicant and a multi-agency review team—including CDFW and the relevant Regional Water

26    Quality Control Board, among others—to evaluate, revise, and refine the THP and its supporting

27    materials, including technical reports, before circulating it for public review and comment.  *See*

28    PRC §§ 4581-4583.5; 14 CCR §§ 1037-1037.11.  Thereafter, CAL FIRE issues a document called

an "Official Response," which responds to the public comments and sets forth CAL FIRE's decision on whether to approve or deny the THP. *See* PRC §§ 4582.6-4582.7; 14 CCR §§ 1037.1, 1037.8. Review team agencies can conduct in-person inspections of the THP area, 14 CCR § 1037, submit a "non-concurrence letter" if they disagree with CAL FIRE's conclusions regarding potential impacts from a THP, 14 CCR § 1037.5, and pursue an administrative appeal of CAL FIRE's approval of a THP to the Board of Forestry, 14 CCR §§ 1056-1056.6. The FPRs expressly prohibit CAL FIRE from approving a THP if harvesting would result in take of a federally- or state-listed species, unless the taking is authorized by the Service (for federally-listed species), CDFW (for state-listed species), or both (for species listed under both the ESA and CESA). 14 CCR § 898.2(d). The FPRs also provide specific measures to avoid take of NSO. 14 CCR §§ 939.9 (procedural requirements for THP review), 939.10 (review standards). THPs covered by SPI's HCP incorporate its measures as enforceable requirements of the THP. *See, e.g.*, Carr Decl., Ex. H at 029, 085-86, 094-95, 201-02.

## FACTUAL AND PROCEDURAL BACKGROUND

### A.    The HCP Is a Product of Extensive Multi-Agency Input and Collaboration

The HCP reflects more than a decade of collaboration among SPI and federal and California agencies to address SO conservation. In 2011, SPI began focused SO surveys and banding to collect data to inform the HCP, and thereafter worked with the Service and CDFW to develop it.[4] *See, e.g.*, AR 1-3 (2013 correspondence regarding a possible NSO HCP), 4 (2014 correspondence regarding SPI's NSO census), 197-201 (agenda for a July 5, 2017 meeting between SPI and the Service), 11035 (email sending a draft HCP with Service and USFS comments in advance of a June 2019 meeting with SPI). The USFS joined the HCP process as a NEPA cooperating agency in early 2017. AR 23, 26-30.

---

[4] The NSO is currently listed as threatened, while the CSO is not. AR 19021; 55 Fed. Reg. 26114 (June 26, 1990); 84 Fed. Reg. 60371 (Nov. 8, 2019). However, the Service is currently evaluating a petition to list the CSO as threatened. 88 Fed. Reg. 11600 (Feb. 23, 2023). To provide benefits for both species and allow for take coverage should the CSO be listed in the future, the HCP treats both species as threatened. AR 19021; *see* AR 41610 (2016 HCP and ITP Processing Handbook). In 2016, the NSO was listed as a threatened species under the California Endangered Species Act (CESA). *See* AR 26587.

SPI'S MPA ISO MOTION FOR SUMMARY JUDGMENT                          Case No. 2:23-cv-02611-TLN-CSK

1       Because the NSO is listed under CESA, CDFW has an independent responsibility for

2   regulating activities that may incidentally take it.  *See* Cal. Fish & Game Code §§ 2080 (take

3   prohibition), 2080.1 (consistency determination), 2081 (incidental take permit).  After the NSO was

4   listed under CESA, CDFW joined the HCP development process in 2017 to coordinate interagency

5   scientific review and regulatory approvals.  AR 648, 650.

6       Environmental review of the HCP and ITP spanned nearly three years.  AR 21681 (Notice

7   of Public Scoping Meetings for EIS in August 2017); AR 18967-81 (Application for ITP and HCP

8   submitted in December 2018); AR 21681 (DEIS released for public comment in May 2019).

9   Following extensive revisions to address public comments, the Final EIS was published on July 31,

10  2020.  AR 16611; *see also* AR 23074-79 (summarizing major changes in Final EIS and HCP to

11  address comments), AR 21459-517 (Final EIS, Exhibit G [responses to comments on Draft EIS]),

12  AR 23084-88 (Record of Decision, Appendix A [responses to comments on Final EIS]).

13      Over the same period, the Service's repeated review of drafts of the HCP resulted in

14  substantial revisions.  *See, e.g.,* AR 650, 651-77 (Service Deputy Assistant Field Supervisor Kim

15  Turner emailing SPI a "first round of comments" from the Service, USFS, and CDFW on

16  November 7, 2017); AR 16584-85 (Deputy Assistant Regional Director Mike Senn providing "A

17  Couple Final Edits" on July 2, 2020).  The Service identified recent, high-quality scientific

18  literature to inform the HCP, which SPI incorporated into its analysis.  *See, e.g.,* AR 724 (advising

19  SPI to use Tempel et al. 2016 as a recent CSO demographic meta-analysis), 19060, 19230, 19241

20  (final HCP relying on Tempel et al. 2016), 725 (identifying Conner et al. 2016 as a recent study of

21  population decline probabilities), 19059, 19331 (final HCP relying on Conner et al. 2016).  The

22  Service also made suggestions to clarify and tighten the HCP's substantive provisions.  *See, e.g.,*

23  AR 3839 (SPI agreeing in April 2018 to account for "long-term uncertainty regarding the potential

24  for even-aged stands to provide owl habitat"), 19161 (final HCP recognizing an SO occupancy

25  decline simultaneous with the increased availability of planted even-aged stands as a "changed

26  circumstance"); *see also* AR 14824 (the Service's proposed criteria for when the Service may allow

27  for variation in the HCP's take limit), 14820-21 (SPI's assent), 19503 (final HCP).

28

SPI'S MPA ISO MOTION FOR SUMMARY                    Case No. 2:23-cv-02611-TLN-CSK
JUDGMENT

1    The Service approved the HCP and issued the ITP on September 30, 2020.  AR 23082.  The

2    ITP authorizes only indirect take through habitat modification; it does not authorize direct take of

3    SO.  AR 23052.  As explained more fully below, the HCP contains an array of protections for both

4    SO subspecies during timber operations, including harvesting, processing, and transport.   AR

5    19031-37.  Under the ITP, those activities are subject to the HCP's requirements, which go above

6    and beyond the already-robust California regulatory regime governing timber harvesting set forth

7    in the FPA and FPRs.  *Supra* at pp. 4-5.  The goals of the HCP are to: (1) "[i]ncrease the amount

8    and distribution of habitat contributing to survival and reproductive capacity of CSO and NSO";

9    (2) "[a]void direct CSO and NSO mortality related to timber harvest and illegal activities"; (3)

10   "[p]rotect habitat elements in current stands and provide key owl habitat needs and specific habitat

11   elements in future timber stands"; and (4) implement a BO "research program that examines

12   important aspects" of the BO invasion of SO "habitat in California."  AR 19085-86 (HCP biological

13   goals), 22933 (Biological Opinion's discussion of biological goals), 19087-110 (HCP CMs).

14       **B.       The HCP Reflects the Evolving Science of Spotted Owl Ecology**

15       SO use three primary types of habitat: nesting, roosting, and foraging.  AR 19047-49.

16   Nesting habitat—which provides space to nest, shelter from weather, and avoid predators—

17   includes large trees with deformities used for nesting, moderate to high canopy cover, a

18   multilayered canopy, decadent features on the ground, and open space under the canopy for owls

19   to fly.  AR 19047-48.  Roosting habitat—which provides shelter to SO while they rest or forage—

20   is like nesting habitat but does not need to have structural features for nesting.  AR 19048.  Finally,

21   foraging habitat—which provides food supply.  AR 19048-49.  Unlike nesting and roosting habitat,

22   foraging habitat includes younger forests, brushy openings in older forests, and edges between

23   forest types where prey density is higher.  *Id.*

24       The Service and SPI were guided by the evolving scientific literature on SO habitat needs

25   and use.  Historically, and coincident with controversy in the 1990s over timber harvesting on

26   public lands in the Pacific Northwest and the Northwest Forest Plan, researchers often characterized

27   the SO as an "old-growth dependent" species, AR 32009, meaning it could only survive and thrive

28   in areas characterized by continuous mature forest.  *See, e.g.,* AR 47006 (Gutiérrez et al. 1992),

- 7 -

43611 (Blakesley et al. 2005). However, more recent literature, building on Franklin et al. (2000), confirms that habitat heterogeneity (i.e., a mix of forest ages and characteristics) is beneficial. *See, e.g.,* AR 19105-06 (HCP Section 5.2.7.9), 29289 (Franklin et al. 2000), 23907 (Atuo et al. 2019). In its opening brief, the Service recognizes this evolution in the understanding of SO habitat needs is based on the scientific literature, including studies of mixed ownership (patchwork of national forests and private) lands. *See* ECF No. 45 at 18-19 and n. 15. Crucially, as explained below, it is confirmed by years of studies SPI conducted *on its own lands*—the very lands covered by the HCP.

The literature shows that habitat heterogeneity is particularly important for foraging—and thus critical for SO survival and reproductive success—because it results in increased production of a primary prey species (dusky-footed woodrat). For example, studies demonstrate "that core areas of spotted owls have greater structural heterogeneity (e.g., increased edge between forest structure classes) than the nest stand and often include areas of lower canopy cover[.]" AR 32037 (Gutiérrez et al. 2017). These studies found that "habitat heterogeneity can promote increased prey diversity, abundance, and population stability[.]" *Id.* In fact, as early as 1992, Call et al. had found that foraging SO used forest with canopy cover as low as 40%, far below what many researchers believed was necessary for effective foraging. AR 44079 (Call et al. 1992); *see also* AR 32037 (discussion in Gutiérrez et al. 2017). In 2000, Franklin et al. identified a link between high habitat fitness and habitat heterogeneity: "too much homogeneity in either spotted owl habitat or other vegetation types" resulted in low habitat fitness. AR 29289. Reproductive output was "enhanced by convoluted edge with little interior habitat." AR 29295; *see also* AR 35531-32 ("survival and population growth [are] positively associated with the amount of habitat edge between shrubs/saplings and forests dominated" by medium-sized trees). In short: a mix of older forests, used for nesting, and younger forests, used for foraging, best supports SO survival and reproduction.

Building on this general literature, studies of SO on SPI lands also found that habitat heterogeneity benefits SO. In 2012, SPI "began a long-term study of CSO occupancy and density within five watershed study areas (WSAs) within the Sierra Nevada[.]" AR 19065 (HCP Section 3.2.2). Study results were reported in Roberts et al. 2017, AR 19065, which concluded that CSO occupancy "was relatively steady or increasing" during the 5 years of study in all five WSAs, each

of which had "long histories of forest management[.]"  AR 34742, 34744.  Hobart et al. 2019a subsequently analyzed 151 SO sites: 84 on USFS's Eldorado Study Area and 67 within SPI's five WSAs.  AR 32676, 32681, 32689.  That study concluded that "[s]patial heterogeneity in ecological conditions"—such as "the juxtaposition of older forest nesting and roosting habitat interspersed with other cover types like younger forests with high basal area of hardwoods"—was beneficial for CSO and resulted in higher occupancy and reproductive probabilities for sites associated with the privately managed timberlands.  AR 32676-77, 32700; *see also* AR 23901-07 (Atuo et al. 2019 finding that SO select "areas containing high heterogeneity in cover types").  In sum, the Service's decision to approve the HCP and issue an ITP was informed by an evolving understanding of SO habitat uses as reflected in both the general literature, as well as studies specific to SPI lands.[5]

SPI has been collecting data on SO habitat preferences for decades.  Starting in 1990, SPI began measuring "cross plots" analyzing the forest characteristics of nearly 500 reproductive sites of key species that depend on mature forest conditions (including 132 cross plots with SO nests).  AR 19424-25 (HCP Appx. 4.2).  This means SPI has been "tracking" SO nests on its lands since 1990.  Based on this accumulated data, SPI developed the Habitat Forms in 2003 to group forest conditions based on predicted habitat use by wildlife.[6]  AR 19380-84 (HCP Appx. 4.1).  These Habitat Forms are foundational to the operation of the HCP and its measures to conserve (and increase) SO habitat.  Habitat Form 1 (HF1) represents young forests, like those reforested after clearcutting or wildfire, and which contain key SO prey species.  AR 19444.  Habitat Form 2 Low (HF2L) contains small trees, especially hardwoods, and is also used by SO for foraging.  *Id.*  Habitat Form 2 Heavy (HF2H) contains medium-size trees, especially hardwoods, and is used for nesting,

---

[5] Franklin et al. 2000 is cited throughout the HCP and its Appendices, as well as the BiOp.  *See, e.g.,* AR 19049, 19084, 19106, 19230, 19279, 19285, 19394, 19455, 22939-40, 22942, 22944, 22946, 22952.  Same for Tempel et al. 2014a, s*ee, e.g.,* AR 19059-60, 19240-41, 19331, 19339, 19457, 19459, 22942, 22946, Roberts et al. 2017, *see, e.g.,* AR 19059, 19065, 19095, 19136, 19230, 19331-32, 19460, 22947-48, and Hobart et al. 2019a, *see, e.g.,* AR 19084, 19106, 19143, 22942, 22944-45, 22948, 22950, 22952.  So, too, for Atuo et al. 2019a, which is cited under the name Atuo et al. 2018 by the HCP and its Appendices.  *See, e.g.,* AR 19067, 19077, 19086, 19103, 19145, 19153, 19452, 22942, 22947.

[6] SPI's Habitat Forms were used in 2015 for a Candidate Conservation Agreement with Assurances for the West Coast Fisher.  AR 19378.

1  roosting, and foraging.  *Id.*  Finally, Habitat Form 4 (HF4) provides large trees with closed canopy

2  used for nesting, roosting, and foraging.  *Id.*  These two latter Forms provide the older forest

3  conditions needed for nesting and roosting.

4        SPI also conducted a "Gradient Nearest Neighbor" (GNN) study, detailed in HCP Appendix

5  3.4, which used machine learning to model habitat suitability and rank the quality of SO nesting

6  habitat on SPI's property.  AR 19230.  To compare its Habitat Forms with its analysis of SO habitat

7  selection, SPI then "overlaid more than a million acres" of "Habitat Form typing with the GNN

8  types."  AR 19275.  SPI calculated an 82% overlap between areas the Habitat Forms defined as

9  nesting habitat (HF4 and HF2H) and areas that its GNN study found SO using as nesting/roosting

10  habitat.  *Id.*  SPI also assembled the then-largest-ever GPS dataset to pinpoint locations the owls

11  actively used for nesting, roosting, and foraging.  AR 19279-313 (Appx. 3.6 [NSO]); AR 19331-

12  66 (Appx. 3.8 [CSO]).  That data shows SO used all Habitat Forms on SPI property roughly in

13  proportion to their availability, with a slight preference for HF4.  AR 19303-05 (Appx. 3.6 [NSO]),

14  AR 19358-60 (Appx. 3.8 [CSO]).  Thus, SPI's research on habitat conditions and SO behavior on

15  its own timberlands provided the foundation for the HCP and its Conservation Measures.

16        **C.**    **The HCP's Conservation Measures Protect SO**

17        The HCP contains eight Conservation Measures (CMs) developed to avoid, minimize, and

18  mitigate potential adverse effects of timber operations on SO.  AR 19085-87.  Each is mandatory

19  under the ITP.  AR 23051-52.  As explained below, several increase and improve SO habitat by

20  limiting and prescribing timber harvesting in ways that go above and beyond what California law

21  requires.  Others specifically address what are now the primary threats to SO: catastrophic wildfire

22  (CM 4) and the BO invasion (CM 8).

23        The HCP's "compliance monitoring" requirements ensure that the CMs are being fully

24  implemented, while its "effectiveness" monitoring and reporting requirements allow the Service to

25  continuously assess the success of the CMs.  AR 19148-55; *see also* AR 19134-147 (Monitoring

26  and Adaptive Management).  Each CM contains a trigger for initiating review by the Service and

27  SPI to remedy any potential shortcomings pursuant to the HCP's Adaptive Management plan,

28  which provides that SPI may implement additional or alternative CMs if new scientific information

indicates they would reduce the level of take. AR 19155-56. Any such changes would not increase the amount of take authorized by the ITP. *Id*. SPI and the Service must meet twice a year to ensure implementation of the HCP is proceeding as intended. AR 19155, 19191-96 (draft meeting agenda).

### 1. CM 1 Increases the Amount of SO Habitat

Under CM 1, SPI will identify, maintain, and increase the amount of land providing nesting, roosting, and foraging habitat most suitable for SO survival and reproduction by imposing restrictions on timber harvesting. AR 19087, 19437-93 (detailing habitat studies and definitions). Those restrictions go above and beyond those required by California's timber harvesting regulations. *See infra* at pp. 17-19. The take coverage (and regulatory certainty provided by the HCP and ITP) enable SPI to manage its timberlands to improve and increase SO habitat without increasing potential take liability for operations and, thereby, devaluing its timberlands. CM 1 measures habitat growth and improvement by way of a landscape metric called Potential Habitat Areas (PHAs), which SPI must nearly double over the permit term. AR 19087 (CM 1), 19135 (yearly monitoring of PHA growth), 19149 (compliance monitoring). A PHA is made of two adjacent 500-acre hexagons (1,000 acres total) of timberlands consisting of at least one Nest Hexagon and one Support Hexagon.[7] AR 19466.

Implementation of CM 1 is monitored through annual updates that quantify projected and completed harvesting, growth, and associated habitat changes. AR 19087. In total, the HCP estimates that lands "qualifying as a PHA are projected to nearly double (from 589,642 to 1,135,604 acres) during the permit period." *Id.*; *see* AR 19111-12 (Table 5.2 and Figure 5.3). And it includes a mechanism to ensure those projections are achieved. If the actual number of PHAs is 10 percent less than the modeled projections during the first 20 years, or 20 percent less after the first 20 years, SPI and the Service must meet and confer. AR 19149. If the Service determines any shortfall is

---

[7] A Nest Hexagon has "(1) at least one contiguous area (a potential nest stand) of at least 50 acres that includes at least 30 acres of HF4 and 20 acres of HF2H; and (2) at least 30 percent HF4; and (3) a total combined HF4 and HF2H of at least 50 percent of the SPI land within the hexagon area. Also, the hexagon must include at least 100 acres SPI land[.]" AR 19465. A Support Hexagon has a "total combined HF4 and HF2H of at least 50 percent" of the SPI land within the hexagon area. *Id.* A Below Threshold Hexagon does not meet either the Nest or Support criteria. *Id.* Additionally, a PHA must have a minimum of 25% (250 acres) of SPI land. AR 19466.

"due to SPI management," SPI can be required to propose a revised management regime to "accomplish the goals of the HCP," including by increasing PHA growth. *Id.*

### 2. CM 2 Restricts Timber Harvesting Within Activity Centers and Surrounding Habitat

CM 2 protects SO habitat at two different scales. First, CM 2 protects habitat around SO Activity Centers (ACs)[8]—areas where owls are known to reside—by establishing 72- to 100-acre Protection Zones (PZs) around all known or newly-discovered ACs. AR 19088-89; *see also* AR 19711-20150 (detailing PZ development and implementation; Appx. 5.2). Second, at the "Hexagon Scale," CM 2 overlays additional protections for NSO and requires that SPI retain 11,762 total acres of the best available NSO habitat close to ACs as habitat refugia for the life of the permit–as a result, SPI may not conduct harvesting within those refugia, regardless of occupancy status, except for salvage operations and minor habitat modifications. AR 19088-89.[9]

PZs are dynamic, moving if the owls move based on SPI's annual surveys to identify "Yearly Activity Centers" (YACs)—roost or nest sites—pursuant to the survey protocol set forth in Appendix 5.4 of the HCP. AR 20199-231; *see also* AR 19714 (Appendix 5.2 regarding PZ development). SPI then draws an 18-acre (500-foot radius) circle around the three most recent known YACs to form a 72-to-100-acre PZ. AR 19715-16. The PZ is designed to include the best available habitat surrounding each YAC, while also accounting for any SO movement in recent years.[10] *Id.* This dynamic protection tracks the seasonal movement of YACs; during each year's breeding season if a YAC is detected outside of the PZ, the PZ is re-drawn to include the new YAC.

Once established, a PZ imposes significant restrictions on harvesting activities. Specifically, no timber harvesting or other vegetation-disturbing operations may occur in any PZ except for pre-

---

[8] An Activity Center is a "location where a single or pair of owls is regularly detected and can be found in the daytime." AR 19015.

[9] Appendix 5.3 explains how SPI tiered NSO ACs to receive varying levels of additional protection and management. AR 20153-95. The ranking system was developed with input from the Service, CDFW, and USFS. AR 20153.

[10] SPI must consider designating PZs up to 100 acres based on "(1) the location of nesting YACs, (2) the location of daytime roost sites, and (3) the quantity, quality, and proximity of other existing habitat suitable for nesting and roosting[.]" AR 19715 (HCP Appx. 5.2).

1    commercial thinning or projects that do not involve timber harvesting and do not significantly

2    modify habitat or affect its function.  AR 19716.  Pre-commercial thinning involves removing trees

3    that are too small to be commercially valuable, AR 19040, and that can inhibit the growth of habitat

4    beneficial to SOs.  AR 19678.  Even then, pre-commercial thinning can only be conducted outside

5    the breeding season or in the breeding season if SO are non-nesting.[11]  AR 19716.  Each PZ must

6    be maintained indefinitely unless it is retired, which requires three consecutive years of negative

7    surveys.  *Id*.  And even once a PZ is retired, it may not be harvested until at least two more years

8    of pre-operational surveys are conducted, as required by Appendix 5.4.  *Id*.

### 3.    CM 3 Restricts Post-Fire Salvage Logging to Protect SO and Their Habitat

CM 3 establishes survey and retention standards for timberlands affected by wildfire.  AR

19090-91, 19097-19103.  CM 3 has two principal features.  First, it incorporates the "protection

and survey requirements" of CM 5 and Appendix 5.4's survey protocol, which, as explained below,

are intended to protect ACs.  AR 19090.  This requires SPI to conduct extensive SO surveys prior

to salvage harvests.[12]  If SO are identified, the AC site receives a PZ of at least 72 acres, consistent

with CM 2.  AR 20227-28, 20257.  Second, where salvage is permitted, the HCP's retention

standards "ensure functional forest structures remain available" to SO.  AR 19090.  This includes

retention of: all undamaged green trees (AR 19090), all known nest structures (AR 19099), and

Habitat Retention Areas (a "representative sample" of species and tree sizes) (AR 19099-100),

including Wildlife Trees (usually the oldest and largest hardwoods or certain non-merchantable

live green conifers) (AR 19100-01) and Legacy Trees (hardwoods $\geq$ 36 inches diameter at breast

height [dbh], or defective conifers $\geq$ 30 inches dbh) (AR 19103).  AR 19090, 19099-103.

### 4.    CM 4 Mitigates Catastrophic Wildfire Risk

---

[11] If the nesting status of an AC cannot be determined, a 0.25-mile no-disturbance buffer must be implemented.  AR 20229.

[12] Before salvaging in the nesting season (Feb. 1 through Aug. 31), SPI must survey any areas within 0.5 miles of a known AC, which consists of 3 nighttime surveys (at least 7 days apart).  SPI must also survey all salvage areas and 0.5 miles surrounding those areas (even in the absence of ACs) whenever there is less than 50% tree mortality.  SPI must conduct 3 nighttime surveys (at least 7 days apart) before salvage harvesting or conduct surveys concurrently with operations that do not modify habitat.  AR 20226-28.

- 13 -

1    Along with the BO, wildfire is the other primary threat to SO and their habitat. AR 19047,

2    19059, 19091, 19158; AR 22941-43, 22982-83, 22986-87. And that threat is only worsening as

3    wildfires become more frequent and intense.  AR 19158-59; AR 22990-91, 22994.  High severity

4    fires have been found to decrease SO occupancy and reproduction and increase the probability of

5    site extinction. AR 22987.

6    CM 4 addresses the risk of catastrophic fire through (i) continued use of even-aged forest

7    management and (ii) creation of a system of fuel breaks and implementation of fuel reduction

8    strategies pursuant to MOUs SPI signed with public agencies and private landowners. AR 19091-

9    19094; *see also* AR 20269-82 (fire risk reduction MOU).  Even-aged management can decrease

10   risks from wildfire by creating "patches of forests of different ages that respond differently to fire,"

11   thereby slowing fire spread and intensity and helping to improve the efficacy of fuel breaks and

12   other firefighting tools. AR 19092. The HCP predicts that "the continued presence of distributed

13   young clearcuts, thinned plantations and older even-aged units will result in a net reduction of risk

14   of high severity fire[.]" AR 19093.

15   Since 2017, SPI has partnered with various public and private organizations, including

16   USFS and CAL FIRE, to address fire threats through a series of MOUs.  AR 19094.  These efforts

17   include coordinating fuel treatments in areas near SO ACs, constructing fuel breaks, and planning

18   fire suppression and response efforts across multi-ownership landscapes.  *Id*.  The HCP commits

19   SPI to complete around 425 miles of fuel breaks within the HCP's first decade.[13]  *Id*.  Additionally,

20   the HCP requires SPI to continue to coordinate on fuel reduction with public agencies, private

21   landowners, and NGOs.  *Id*.  The American Relief Act (H.R. 10545), signed into law by President

22   Biden on December 21, 2024, recognized the threat to the environment posed by wildfire on

23   national forests in northern California and Oregon.  That law appropriated $75 million for the

24   construction or maintenance of shaded fuel breaks, deeming it necessary to address an "emergency."

25   P.L. 118-158, 138 STAT. 1722 at 1751-52.  SPI's special expertise and success in constructing fuel

26   breaks was recently affirmed by the conclusion of a Stewardship Agreement between USFS and

---

27   [13] According to SPI's 2023 Annual Report, SPI constructed 6,242 acres of fuel break in 2023, in

28   addition to the 76,891 acres SPI had previously built.  There were also 26,696 planned acres of
     additional fuel break, plus 36,425 acres for future construction.  Murphy Decl., Ex. B at 5.

SPI that provides for SPI to do that work in partnership with USFS. *See* Carr Decl., Ex. I. Long-time USFS Chief Randy Moore explained: "Sierra Pacific Industries is well-versed in what must be done to tackle the ongoing threats facing forests and towns in California and Oregon . . . This partnership will leverage our collective expertise to do strategically focused work and add to our broader collaboration on both prevention and post-fire restoration aimed at keeping our forests productive and healthy." Carr Decl., Ex. J.

### 5.    CM 5 Protects Reproductive Sites (Occupied Activity Centers) from Harvest

CM 5 protects SO reproductive sites by establishing pre-harvest survey protocols and designating seasonal buffers around all occupied ACs. AR 19094-96 (CM 5), 20199-20232 (survey protocols), 20228-29 (buffers). No harvesting or vegetation-disturbing activity may occur within 0.25 miles of occupied ACs from March 15 to August 31 absent conclusive evidence that no nesting occurred, nesting failed, or young have fledged and are capable of sustained flight. AR 19095.

### 6.    CM 6 Reduces Threats from Illegal Activities

CM 6 reduces risks to SO from toxic anti-coagulant rodenticides used in marijuana cultivation, and from firewood harvesting that removes habitat elements (required to be retained by CM 7), by implementing control measures to prevent illegal uses of SPI lands. AR 19096-97; *see* AR 22954, 22992-93. SPI must maintain "gated roads, daily patrols and camera surveillance[,]" prevent public camping, and limit motorized use to existing roads. AR 19096-97.

### 7.    CM 7 Retains Habitat Features in Future Timber Harvests

CM 7 provides standards for retaining landscape elements during harvest planning, including known SO nest structures, hardwood trees, down logs, snags, and green culls used by SO and its prey.[14] AR 19097-109 (CM 7 summary); 19145-47 (monitoring of retention standards). These retention standards are intended to enable SO to continue to hunt in future harvested areas and to improve future habitat quality. AR 19097-98. They must also be incorporated into all current and future THPs, making them enforceable by CAL FIRE. AR 19029, 19098-99.

---

[14] A "snag" is "a dead tree that contains less than 25 percent sound merchantable wood in its bole." AR 19017. A "green cull" is "a live tree which contains less than 25 percent sound merchantable wood in its bole." AR 19015.

8.      **CM 8 Addresses the BO Invasion**

BO are, besides wildfire, the other primary threat to SO.  AR 22983; *see also* AR 19057, 19061.  As BO expand into historical SO territory, they reduce SO "site occupancy, fecundity, reproduction, apparent survival, and detectability" and contribute to declines in SO populations. AR 22941, 22983-86.  BO compete with SO for food resources and habitat and physically attack the smaller and less resilient SO.  AR 22983-84; *see* AR 33229-30 (Kelly and Forsman 2004).  CM 8 provides for the implementation of a BO research program, which requires SPI to remove BO in the Plan Area and beyond.  AR 19109-10, 20263-68 (research program).  According to the Biological Opinion (BiOp), BO removal "has been demonstrated to reduce effects to spotted owl occupancy, survival, and reproduction, and spotted owls are known to re-occupy their former ACs following removal of barred owls[.]"  AR 22953.  In addition to removing BO from this HCP's Plan Area, the program will inform the Service's broader NSO and CSO conservation strategies by improving scientific understanding of BO genetics and BO prey species. AR 19110.[15]

D.      **Every Agency Involved Signed Off on the HCP**

The Service considered and approved SPI's proposed HCP and issued a Final Environmental Impact Statement (FEIS), BiOp, Incidental Take Permit (ITP), and Record of Decision (RoD).  AR 21679-22615, 22925, 23051-53, 23069-88.  The RoD details the Service's decision-making process, including intra-Service consultation as required by Section 7 of the ESA, 16 U.S.C. § 1536.  AR 23069.  The Service and CDFW commented on multiple iterations of the HCP.  *See, e.g.,* AR 742-799; 2744-2862.  CDFW's Robert Hawkins, then a Senior Environmental Scientist, was closely involved in the HCP's development beginning in 2017, *see* AR 648, providing scientific feedback and analysis throughout.[16]  And because the NSO was listed as a

---

[15] As previously noted, EPIC recently sought, and was granted, intervention, to defend the Service's Barred Owl Management Strategy in two separate cases.  Carr Decl., Exs. D, E, F, G.

[16] *See, e.g.,* AR 682 (comments on draft HCP chapters 1 through 4 in 2017); AR 2922, 2927 (further comments in 2018); AR 6321 (questioning the sufficiency of Habitat Retention Areas); AR 12633 (comments on the Appendix 5.4 survey protocol in 2019); AR 14568 (reviewing the Adaptive Management and Changed Circumstances sections).  The final HCP reflects Hawkins's input.  For example, in response to his concern about the purpose of Habitat Retention Areas, SPI clarified Appendix 4.6's language to better explain those areas are intended to create future nesting habitat by "allowing for several decades of growth and increasing decadence[.]"  AR 8428.

SPI'S MPA ISO MOTION FOR SUMMARY JUDGMENT

Case No. 2:23-cv-02611-TLN-CSK

threatened species under CESA in 2016, CDFW also exercised its own independent authority in reviewing the HCP and ITP for "consistency" with CESA's incidental take permitting requirements and issued a Consistency Determination in November 2020.  Murphy Decl., Ex. C.

**E.    Take in the Form of Habitat Modification Is Measured in Hexagons**

The HCP permits SPI to indirectly "take" a specified quantity of SO through habitat modification.  AR 19121.  Take is modeled when harvest activities cause habitat conditions in an "Occupied Hexagon" to drop from "Nesting" to "Support" or "Below Threshold," or if it is already "Support," to drop to "Below Threshold."  Take is also modeled to occur if the Occupied Hexagon's habitat condition was already Below Threshold when harvesting is commenced.[17]  AR 19118. Every year SPI must model its harvests, project whether harvests will result in take if implemented, and report these instances of potential take to the Service for review.  AR 19119.  Annually, after operations have been conducted, SPI and the Service review each modeled numerical take; this "true-up" includes a satellite-image review of surrounding habitat and the Service confirms or rejects the rule-based estimate of take.  *Id.*

While the HCP generally assumes that multiple entries into a single Occupied Hexagon during a five-year period will not result in multiple instances of take, it recognizes that may not always be the case.  As explained in the BiOp, if the Service finds that subsequent operations "have resulted in impacts to an occupied [Activity Center], the Service and SPI will work together to determine if actual [indirect] take has occurred more than once during that time period."  AR 22958.

**F.    The HCP Far Exceeds What State Law Would Otherwise Require**

As explained above, the California FPA and FPRs impose the most stringent timber harvesting regime in the country.  The HCP nevertheless goes above and beyond what state (and federal) law require in several key respects.  First and foremost, California law does not require SPI to grow *any* new nesting habitat for SOs, let alone double the amount of nesting habitat on its lands as CM 1 requires.[18]  AR 19087.  And while California's timber harvesting regime has certain

---

[17] An Occupied Hexagon contains one or more Occupied Activity Centers.  AR 19016.  An Occupied Activity Center is a site where a visual or audio detection of an SO occurs.  *Id.*

[18] Absent the HCP and ITP, SPI would be incentivized to manage its lands so as to not increase PHAs—making them less hospitable to SOs—in order to avoid potential take liability.

requirements for NSO and their habitat, the HCP and ITP impose yet more requirements to benefit the species. *Compare* 14 CCR §§ 939.9, 939.10 (AR 16291-93; requiring no long-term habitat protection for NSO) *with* HCP section 5.2.2 (AR 19088-89; requiring 50-year protection of 11,762 acres of best available NSO habitat). When it comes to the CSO, the FPRs have neither CSO-specific nor more general requirements that apply to the CSO and its habitat.[19] The HCP, in contrast, requires robust protections for the CSO, including PZs, hexagon scale protections, pre-operational surveys, and seasonal restrictions on harvesting. AR 19087-89, 19095, 20197-232 (survey protocol). And the HCP's protections for SO affected by wildfire—including surveys prior to salvage and retention of Wildlife, Legacy, hardwood, and all known nest trees[20]—are not required by the FPA or FPRs. AR 19099-104. Lastly, the HCP requires SPI to address the BO invasion, including by removing up to 150 BO per year, AR 19109-10 (CM 8), which also is not required by California law. These and other key differences are summarized in the following table.

|  | CA Law | HCP |
|---|---|---|
| Requirements to grow new SO habitat? | No. | Yes, SPI is required to nearly double the acreage of PHAs. AR 19087. |
| Requirements to set aside long-term refugia for NSO? | No. | Yes, SPI must retain 11,762 acres of the best available habitat for the life of the permit. AR 20154. |
| Requirements to conduct pre-operational surveys for CSO? | No. | Yes, SPI must conduct pre-operational surveys for both CSO and NSO. AR 20205-60. |
| Requirements for minimum avoidance buffers for occupied CSO ACs? | No. | Yes, SPI must implement minimum 72-acre PZs for both CSO and NSO occupied ACs. AR 19715. |
| Requirements for pre-operational surveys before salvage operations? | No. | Yes. AR 20226-28. |
| Requirements to implement seasonal harvest restrictions for CSO? | No. | Yes, SPI must implement 0.25-mile buffers around CSO occupied ACs from March 15 to August 31. AR 19095. |

---

[19] For example, the occupied nest protections provided by 14 CCR § 939.2(d) only apply to certain "sensitive" species, and the CSO is not one of them. AR 16289; AR 16194 ("sensitive species" list).

[20] While the FPRs only require Nest Trees to be retained while nests are active (generally 3-5 years), the HCP requires all known SO Nest Trees to be retained for the entire permit term. AR 19098.

SPI'S MPA ISO MOTION FOR SUMMARY JUDGMENT

Case No. 2:23-cv-02611-TLN-CSK

| Requirements to retain all previously used SO nest trees? | No (only active nest trees). | Yes, SPI must retain all previously used nest trees.  AR 19099. |
| Requirements to retain Habitat Retention Areas, Wildlife Trees, Legacy Trees, Additionally Retained Trees, and hardwoods in salvage harvests? | No. | Yes. AR 19090, 19098-99. |

## STANDARD OF REVIEW

Because the Government summarized the APA's standard of review (*see* ECF No. 45 at 14), we will not further explain it other than to emphasize how it applies to the decisions the Service was called upon to make here.  When a court is reviewing agency action, it reviews "the whole record or those parts of it cited by a party" to determine whether the action is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law[.]"  5 U.S.C. § 706(2)(A).  "This standard of review is highly deferential, presuming the agency action to be valid and affirming the agency action if a reasonable basis exists for its decision."  *Pac. Coast Fed'n of Fishermen's Ass'ns v. Blank*, 693 F.3d 1084, 1091 (9th Cir. 2012).  The HCP and ITP concern the Service's "area of special expertise" and thus this Court's review is "at its most deferential."  *Baltimore Gas and Elec. Co. v. Nat'l Res. Def. Council, Inc.*, 462 U.S. 87, 103 (1983); *Forest Guards. v. U.S. Forest Serv.* 329 F.3d 1089, 1099 (9th Cir. 2003).  This "most deferential" review reflects the challenges inherent in making decisions "at the frontiers of science" and cautions that "[a]n agency's actions need not be perfect."  *Id*.  So too, courts also "give great deference to the agency" when its decision involves matters of "scientific prediction."  *Ecology Ctr. v. Castaneda*, 574 F.3d 652, 664 (9th Cir. 2009).  Thus, a reviewing court may "only set aside decisions that have no basis in fact."  *Id*. (citing *Bureau of Ind. Affs. v. FLRA*, 887 F.2d 172, 176 (9th Cir. 1989)).

When "a party seeks review of agency action under the APA, the district judge sits as an appellate tribunal."  *Am. Bioscience, Inc. v. Thompson*, 269 F.3d 1077, 1083 (D.C. Cir. 2001).  The function of the Court in reviewing an administrative decision "'is to determine whether or not as a matter of law the evidence in the administrative record permitted the agency to make the decision it did.'"  *City & County of San Francisco v. U.S.*, 130 F.3d 873, 877 (9th Cir. 1997) (quoting *Occidental Eng'g Co. v. INS*, 753 F.2d 766, 769 (9th Cir. 1985)).  "In reviewing an administrative

- 19 -

1  agency decision, 'summary judgment is an appropriate mechanism for deciding the legal question

2  of whether the agency could reasonably have found the facts as it did.'" *Id.*  The Service has lodged

3  an extensive administrative record—spanning some 70,000 pages—from which the Court can

4  assess its findings.  *See* ECF Nos. 30, 36.

## ARGUMENT

### A.    EPIC's Claims Should Be Dismissed for Lack of Standing

7        As a threshold matter, EPIC lacks standing.  Standing contains three elements: (1) "the

8  plaintiff must have suffered an injury in fact—an invasion of a legally protected interest which is

9  (a) concrete and particularized; and (b) actual or imminent, not conjectural or hypothetical[,]" (2)

10  there "must be a causal connection between the injury and the conduct complained of—the injury

11  has to be fairly traceable "to the challenged action of the defendant," and (3) "it must be likely, as

12  opposed to merely speculative, that the injury will be redressed by a favorable decision." *Habeas*

13  *Corpus Res. Ctr. v. U.S. Dep't of Just.*, 816 F.3d 1241, 1248 (9th Cir. 2016) (cleaned up).  EPIC

14  bears the burden of establishing standing.  *Friends of the Earth, Inc. v. Laidlaw Env. Servs. (TOC)*

15  *Inc.*, 528 U.S. 167, 180 (2000).  And as an organization, EPIC must demonstrate standing by

16  showing that at least one of its members has standing to sue on his or her own.  *Id.* at 181.  "The

17  relevant showing for purposes of Article III standing . . . is not injury to the environment but injury

18  to the plaintiff."  *Id.* at 169.

19        EPIC has failed to carry its burden.  As EPIC has previously acknowledged, the BO is a

20  primary threat to the SO that must be addressed for the species' long-term survival.  *See* AR 22941-

21  43; Carr Decl., Ex. A.  Indeed, in prior lawsuits EPIC claimed injury from the absence of any

22  measures to address BO.[21]  And this year EPIC intervened in two district court lawsuits challenging

23  the Service's Barred Owl Removal Strategy for Washington, Oregon, and California.[22]  Here, the

24  HCP addresses that threat through a research and removal program (CM 8)—a critical component

---

[21] *Env't Prot. Info. Ctr. v. U.S. Forest Serv.*, 2004 WL 2336207, at *30-31 ("The EA failed to disclose and analyze the potential impacts of barred owl expansion into northern spotted owl habitat."); *Conservation Cong. v. Finley*, No. 11-4752-SC, 2012 WL 2989133, at *14 (N.D. Cal. June 28, 2012) (EPIC argued "that the FEIS and SEIS completely fail to consider the significant threat posed by the barred owl[.]").

[22] *See* Carr Decl., Exs. D, E, F, G.

- 20 -

1   of this HCP that EPIC never mentions despite having described it as a "keystone piece" of the HCP.

2   AR 23389. Instead, EPIC shifts gears to argue that SPI's harvesting of timber on its private lands

3   as authorized by California law causes its members psychic injury. *See* ECF No. 38-1 at 5:10-11;

4   ECF No. 38-2 at 3:27-4:2; ECF No. 38-3 at 3:2-4. EPIC is not being straight with the Court.

5        Any claim of standing is further undercut by the nature of the HCP and ITP, which do not

6   authorize direct take, i.e., the killing or injuring of individual SO, and instead only cover potential

7   indirect harm through habitat modification across more than a million acres of private land. EPIC

8   never explains why SPI's logging of its private lands (long predating the HCP and ITP) and the

9   CMs (which will increase and improve habitat for SO on those lands) constitute an injury.

10       Further, even assuming *arguendo* that EPIC can demonstrate a cognizable injury, its

11  requested relief would only exacerbate that injury. Recent reports required by the HCP show not

12  only that minimal take has occurred, but also that the HCP is functioning precisely as intended to

13  benefit the species and expand potential SO habitat. Murphy Decl., Ex. B (2023 Annual Report)

14  at 1-35. Moreover, the implementation of CM 8 alone is estimated to have led to the birth of over

15  70 additional SO. Murphy Decl., Ex. B at 29. If EPIC were to succeed in setting aside the HCP

16  and ITP, SPI would not implement CMs that have greatly benefitted SO in recent years and would

17  have no incentive to increase and improve SO habitat, let alone stem the BO invasion of its

18  timberlands. On this record, the Court would be well within its discretion to deny EPIC's motion

19  for lack of standing. *See Salmon Spawning and Recovery Alliance v. Gutierrez*, 545 F.3d 1220,

20  1227 (9th Cir. 2008).

21  **B.    The HCP's Conservation Measures Minimize and Mitigate the Impacts of Take
        to the Maximum Extent Practicable**

22

23       EPIC alleges the HCP fails to minimize and mitigate the impacts of expected incidental take

24  to the maximum extent practicable because three of eight CMs do not apply the best available

25  science. ECF No. 38 at 29:7-33:11; *see* 16 U.S.C. § 1539(a)(2)(B). EPIC's claims are incorrect as

26  a factual matter, and its arguments are insufficient to carry its burden as a matter of law.

27       Stated simply, the duty to "minimize" and "mitigate" means to "offset" the impacts of take.

28  *Union Neighbors United, Inc. v. Jewell*, 831 F.3d 564, 583 (D.C. Cir. 2016); *see also Oregon-*

- 21 -

1     *California Trails Ass'n v. Walsh*, 467 F.Supp.3d 1007, 1065 (D. Colo. 2020) (The Service "properly

2     made a maximize-mitigation finding" because the permittee "will fully offset the impacts of the

3     taking[.]").[23] If "combined minimization and mitigation fully offset the take, it does not matter

4     whether [the permittee] *could* do more; [the permittee] has already satisfied what is required under

5     the ESA." *Union Neighbors*, 831 F.3d at 583.

6        Rather than confront the entire HCP, EPIC attempts to poke holes in three of the eight CMs.

7     This is improper for two related reasons. First, EPIC's cherry-picking is insufficient as a legal

8     matter because the duty to minimize and mitigate is assessed "with respect to a permit application

9     and the related conservation plan" as a whole, not each individual CM. 16 U.S.C. § 1539(a)(2)(B);

10    *see Union Neighbor*s, 831 F.3d at 578 (evaluating whether multiple measures together satisfied the

11    duty to minimize and mitigate). Thus, EPIC's gambit of cherry-picking and flyspecking three of

12    the HCP's eight CMs fails to show the HCP violates the "minimize and fully mitigate" standard.

13       Second, even if EPIC's claims regarding CMs 1-3 are correct (which they are not), that does

14    not and cannot alter the Service's conclusion that *the CMs taken together* will more than "fully

15    offset" expected take. In approving the HCP and ITP, the Service determined that the "effects of

16    take will continually be mitigated by the Conservation Measures, and no take effects would remain

17    to be mitigated in any period." *See* AR 19131. Moreover, EPIC continues to assiduously avoid

18    discussion of CM 8 even though the Service was clear that it alone will "entirely mitigate for the

19    impact of the projected take" by removing BO, thereby enabling "higher amounts of reproduction

20    than the projected loss."[24] AR 19181. EPIC never challenges that factual finding or even attempts

21    to find error with CM 8. And because CM 8 fully offsets the impacts of incidental take, the Service

22    "has already satisfied what is required under the ESA." *See Union Neighbors*, 831 F.3d at 583.

23    For these reasons, EPIC's claims that CMs 1, 2, and 3 do not meet the "minimize and fully mitigate"

24

25

26    [23] "The statutory standard of minimizing and mitigating the impacts of the take 'to the maximum
      extent practicable' under ESA Section 10(a)(2)(B)(ii) will always be met if the HCP applicant

27    demonstrates that the impacts of the taking will be fully offset by the measures incorporated into
      the plan." AR 41663 (2016 HCP and ITP Processing Handbook).

28    [24] CM 8 will allow around 9.6 additional juvenile SO to be born each year. AR 19129.

SPI'S MPA ISO MOTION FOR SUMMARY           Case No. 2:23-cv-02611-TLN-CSK
JUDGMENT

1  standard fail.[25]  *See* ECF No. 38 at 29:13-30:23 (CM 1), 30:24-31:24 (CM 2), 31:25-33:11 (CM 3).

2  While the Court can end its analysis here, below we address each of EPIC's challenges to CMs 1-

3  3 for completeness.

### 1.  CM 1 Applies the Best Available Science by Providing Habitat that Supports the SO's Full Life Cycle

5  EPIC says CM 1, which requires SPI to increase Potential Habitat Areas over time as

6  timberlands mature, uses habitat definitions that do not find support in EPIC's preferred studies.

7  ECF No. 38 at 29:18-19.  EPIC starts by wrongly assuming SO depend on mature and old-growth

8  (also referred to as "late-seral") forest habitat conditions (large trees and dense canopy).[26]  ECF No.

9  38 at 30:2-4.  That position is inconsistent with the evolving understanding of SO habitat needs, as

10  discussed above, *supra* pp. 7-10.  Moreover, the HCP relies on bespoke studies that SPI conducted

11  on its own lands—the exact same lands covered by the HCP—as well as published literature on SO

12  ecology (including more studies involving SPI lands) to conclude otherwise. Compared to the three

13  off-site studies EPIC offers, the Service was guided by literature based upon and relevant to the

14  wildlife and habitat of the HCP Plan Area.

15  At bottom, EPIC merely attempts to elevate its preferred articles over the science relied on

16  by the Service. That position is inconsistent with the law and unsupported by the record.  The

17  Service's choice of scientific authority is entitled to considerable deference.  *Marsh v. Oregon*

18  *Natural Resources Council*, 490 U.S. 360, 361 (1989) (courts "must defer to the informed discretion"

19  of the agency where "analysis of the documents requires a high degree of technical expertise").

20  Indeed, an agency's choice of "what constitutes the best scientific and commercial data available

---

[25] EPIC wants SPI to stop harvesting timber on the entire Plan Area. *See, e.g.,* ECF No. 38 at 11:10-18.  But the ESA "does not suggest that an applicant must ever do more than mitigate the effect of its take of species."  *Nat'l Wildlife Fed'n v. Norton*, 306 F. Supp. 2d 920, 928 (E.D. Cal. 2004) (ruling the level of mitigation need only be "rationally related to the level of take under the plan").  In essence, EPIC asks this Court to fault the Service for not exceeding its statutory authority and traducing constitutional limits.

[26] This claim is belied by the record.  In 2018, the Plan Area included "no unentered old-growth" forestlands, AR 19071, lands that EPIC insists are necessary for SO to flourish, ECF No. 38 at 18:24-26.  Yet SPI routinely identified nesting SO on its lands.  As of January 1, 2018, there were 199 occupied SO Activity Centers.  AR 19685.  And that number has steadily increased since; in 2022, for example, SPI confirmed 340 occupied Activity Centers. Murphy Decl., Ex. A at 25.

SPI'S MPA ISO MOTION FOR SUMMARY JUDGMENT

Case No. 2:23-cv-02611-TLN-CSK

1    is itself a scientific determination deserving of deference." *San Luis & Delta-Mendota Water Auth.*

2    *v. Locke*, 776 F.3d 971, 995 (9th Cir. 2014) (internal quotations omitted) (cautioning courts to "be

3    especially wary of overturning such a determination on review").  The Service's decisions here

4    were not just well reasoned but also bolstered and corroborated by a robust inter-agency dialogue.[27]

5        The record reflects years of careful research proving that the HCP's Habitat Forms and

6    thresholds within the hexagon system accurately describe and provide nesting, roosting, and

7    foraging habitat to support the SO's full life cycle.  The hexagon framework, in conjunction with

8    SPI's robust harvest planning, ensures that an SO's "kitchen"—foraging habitat necessary for its

9    reproductive success—is located near its "bedroom," or nesting habitat.  AR 19465-66.  EPIC's

10   arguments regarding CM 1 rest on a mischaracterization, or at least a misunderstanding, of the

11   HCP's scientific underpinnings.  For example, EPIC points to the Gradient Nearest Neighbor (GNN)

12   study SPI carried out in 2018 to claim SO "strongly select" for areas with thick, large trees.  ECF

13   No. 38 at 29:22-28.  But the data only shows a slight preference for larger trees (i.e., HF4 and HF2H

14   types), AR 19303-05, 19358-60, and even then, the study showed an 82% overlap between the

15   nesting habitat SO were observed using and habitat defined as HF4 and HF2H.  AR 19275.  In

16   other words, the GNN study proves SO "strongly select" for the very same Habitat Forms EPIC

17   claims are inadequate for identifying suitable nesting habitat.  EPIC next claims SPI data does not

18   show strong selection for HF4 habitat because SO exclusively prefer forests with larger trees and

19   thicker canopy than HF4 provides, ECF No. 38 at 30:1-2.  But the referenced data shows SO

20   preferring HF4 but also using other habitat, including HF2H and HF2L, which have even younger

21   trees and less canopy than HF4.  AR 19303, 19358.

22       Furthermore, EPIC's insistence that SO only use homogenous late-seral habitat, *see* ECF

23   No. 38 at 30:3-4, is inconsistent with the best available scientific literature on SO habitat

24

[27] USFS and CDFW provided independent scientific review throughout the HCP development
25   process, AR 19025, and USFS served as a cooperating agency under NEPA.  AR 21691.  CDFW
     also issued a Consistency Determination for NSO following the issuance of the ITP.  Murphy Decl.,
26   Ex. C.  To issue a Consistency Determination, CDFW must find that the HCP and ITP "minimized
     and fully mitigated" impacts from the authorized take.  Cal. Fish & Game Code §§ 2080.1,
27   2081(b)(2).  CDFW's decision further shows the Service's exercise of "discretion" was
     "informed[.]"  *See Marsh*, 490 U.S. at 361.
28

1  requirements. *E.g.,* AR 35517, 35531 (Tempel et al. 2014a); AR 32700 (Hobart et al. 2019a). As

2  discussed above, *supra* pp. 7-10, the scientific community's understanding of SO ecology and

3  habitat needs has evolved to recognize that SO benefit from heterogenous habitat, as adumbrated

4  by Franklin et al. in 2000. AR 29289. EPIC ignores this science and fails to mention that not one

5  of the three studies it musters was conducted on the HCP lands.[28] ECF No. 38 at 30:4; *see* AR

6  35546 (Tempel et al. 2016), 33094 (Jones et al. 2018), 70935 (Blakey et al. 2019). More

7  importantly, the record is clear the Service relied on the best information available and explained

8  why it did so, including discussing studies cited by EPIC.[29] And the Service provided a reasoned

9  explanation for its scientific judgment. EPIC provides no basis to conclude the Service somehow

10  erred by "disregard[ing]" evidence "that is in some way better than the evidence" it used. *See San*

11  *Luis & Delta-Mendota Water Auth.*, 776 F.3d at 995. The Service applied the "best available

12  science," which confirms that the HCP provides habitat of sufficient quality in sufficient quantity

13  for the conservation of SO.[30]

14       Last, EPIC argues the HCP is flawed because (i) the Habitat Forms do not account for

15  "decadent" forest components and (ii) the HCP does not protect these elements during logging.

16  ECF No. 38 at 30:19-23. EPIC is wrong on both counts. First, the process SPI used to inventory

17

18  [28] Jones et al. 2018, for example, used study areas "primarily located within national forests (with intermixed private land)" and "within two national parks[.]" AR 33092. The study did not focus
19  on private lands, AR 33091, which have experienced more historical logging and have higher densities of SO with higher occupancy and reproductive rates. Indeed, while Jones et al. 2018
20  observed declining SO populations in all national forest study areas, AR 33096, the opposite trend is apparent on SPI land, AR 34744 (Roberts et al. 2017 observing that SO occupancy was
21  "relatively steady or increasing" during 5 years of study on SPI land).
22  [29] The HCP explicitly discusses Tempel et al. 2016. AR 19060, 19084, 19230, 19241, 19340. So does the BiOp. AR 22942. The HCP also cites Jones et al. 2018 (although it refers to it as "Jones
23  et al. 2017"), AR 19230, 19060, as does the BiOp, AR 22942. While neither the HCP nor the BiOp cites Blakey et al. 2019 directly, both rely upon Atuo et al. 2019a, which does cite Blakey et al.,
24  AR 32695; *see* AR 19067, 19077, 19086, 19103, 19145, 19153, 19452 (HCP citing the study as
25  "Atuo et al. 2018"); 22942, 22947 (BiOp citing Atuo et al. 2019).
26  [30] EPIC also claims the Potential Habitat Area contravenes a 2016 CDFW guidance document. ECF No. 38 at 31:15-24. Not so. That document recommends retaining 500 feet of habitat around
27  a nest (~18 acres), plus a total of 1,336 acres within 1.3 miles that includes "functional foraging habitat." AR 27027. The HCP requires protection of more habitat surrounding a nest (i.e., at least
28  72 acres per CM 2), and each Potential Habitat Area covers 1,000 acres (including nesting and foraging habitat). AR 19456.

- 25 -

1    its lands and generate the Habitat Forms confirmed that decadent features (e.g. snags and logs)

2    were evenly distributed across SPI's lands due to SPI's longstanding management practices.  AR

3    19379-80.  Because of this relatively even distribution, those decadent features were not explicitly

4    called out and were instead subsumed in the Habitat Form definitions.  AR 19380.  Second, EPIC

5    fails to even mention CM 7, which must be implemented in every THP and requires SPI to retain

6    decadent habitat features that support SO occupancy, *see*, *supra* p. 15.  AR 19098-105.  These

7    habitat element retention requirements go above and beyond what is required by California law,

8    *supra* at pp. 17-19, and will allow replanted forests to provide foraging and, later, roosting and

9    nesting habit for SO as the trees mature.[31]  AR 19097-98.

10    In sum, CM 1 applies the best available science and contributes to the HCP's minimization

11    and mitigation of the impacts of take.

12        **2.**      **EPIC Misunderstands CM 2, Which Strictly Protects Occupied SO Sites**

13                 **from Logging**

14    EPIC next takes aim at CM 2, claiming that this measure—which goes above and beyond

15    the FPRs by prohibiting timber harvesting within Protection Zones—is inconsistent with the best

16    available science and prior Service guidance.  ECF No. 38 at 30:24-31:24.  In effect, EPIC claims

17    that SPI should *never* be able to harvest a formerly occupied site because a SO can always reoccupy

18    a site and surveys cannot establish SO absence with metaphysical certitude.  *Id.*  The argument

19    fundamentally misunderstands how CM 2 works in concert with the HCP's other protections.

20    EPIC first argues that CM 2 allows habitat protections around Activity Centers to end after

21    three consecutive years of negative SO surveys.  ECF No. 38 at 30:25-27.  Not true.  While a PZ

22    may be "retired" after three years of negative surveys, at least two more years of negative surveys

23    are needed before any of those areas can be harvested, for a total of *five* years of pre-operational

24    surveys.  AR 19716.  EPIC then seeks to leverage its misreading to claim CM 2 is inconsistent with

25    the Service's 2008 Technical Assistance to CAL FIRE.  *See* ECF No. 38 at 31:15-24.  Not so.

26    There is no conflict because: (i) the HCP requires 5 years of surveys (not 3 years), AR 19716, and

27    (ii) the HCP accounts for other factors the Service's Technical Assistance identifies as necessary

---

28    [31] *Compare* AR 19097-98, 19105 (HCP requirements), *with* AR 16289 (14 CCR §§ 939.1, 939.2).

SPI'S MPA ISO MOTION FOR SUMMARY
JUDGMENT

Case No. 2:23-cv-02611-TLN-CSK

1    to determine abandonment, such as habitat conditions and survey quality, AR 23490.[32]

2        EPIC's remaining objections to CM 2 fare no better.  For example, EPIC expresses concern

3    that SO detection "has become increasingly [sic] because if barred owls are present, they suppress

4    spotted owl survey responses, leading to false negative results."  ECF No. 38 at 31:12-14.  But

5    EPIC does not disclose that SPI's survey protocol already accounts for potential complications

6    from BO, AR 20212, and EPIC ignores CM 8, which requires SPI to collect BO and thereby reduces

7    the rate of any false negatives over time.  AR 19110.  SPI's survey protocol had a 97% probability

8    of detecting SO *before* CM 8 went into effect.  AR 20205.  Here, the record shows the Service

9    exercised "scientific prediction" based on its professional judgment about data and information in

10   the record, commending "great deference" to the Service's decisions.  *Ecology Ctr.*, 574 F.3d at

11   664.  The "best available science" standard does not require "absolute confidence[,]" *Arizona Cattle*

12   *Growers' Ass'n v. Salazar*, 606 F.3d 1160, 1164 (9th Cir. 2010), but SPI's surveys come close.

### 3.    EPIC Misreads CM 3, Which Protects Current and Future SO Habitat During Salvage Harvest

15       EPIC lastly attacks CM 3, which specifies pre-salvage surveys and salvage harvest retention

16   standards, asserting it provides only "minimal restrictions."  *See* ECF No. 38 at 31:26-28.  Wrong

17   again.  The argument mischaracterizes critical aspects of CM 3 that are specifically intended to

18   mitigate the impacts of salvage harvests on SO.[33]  First, EPIC claims that the HCP does not require

19   any avoidance measures even if owls are found in an area to be salvaged.  ECF No. 38 at 32:22-25.

20   This is false.  SO detected by pre-salvage surveys receive the same substantial avoidance buffers

---

[32] It bears emphasis that SPI's survey protocol to determine Activity Center occupancy (HCP Appendix 5.4) is rigorous and accurate.  AR 20197-260.  That protocol, which combines SPI's detailed knowledge of SO on its lands and the Service's 2012 NSO survey protocol, has been shown to correctly identify SO presence more than 97% of the time.  AR 20205.  And that accuracy has improved since the HCP was approved.  Murphy Decl., Ex. B at 58 (demonstrating 99% probability of detection in Watershed Study Areas in 2023).

[33] Among other misrepresentations, EPIC claims that "in severely burned areas where *most* or all trees are killed," SPI "can satisfy retention standards merely by leaving standing dead trees."  ECF No. 38 at 32:2-3 (emphasis added).  But the HCP provides that only "[i]f *all* the trees are dead, the retention standards will be met with dead trees."  AR 19090 (emphasis added).  SPI obviously cannot retain living trees if none remain.

and PZs as all SO detected on SPI property.[34]  AR 20226-28 (Appx. 5.4); 19716 (Appx. 5.2 [limitations on harvest in Protection Zones]).  Second, EPIC claims CM 3 provides no conservation benefit beyond the No Action Alternative.  ECF No. 38 at 32:28-33:2.  Not so.  In addition to extensive pre-salvage surveys, CM 3 requires that salvage harvests retain important habitat elements such as snags and large trees.[35]  AR 19090-91.  This is a significant departure from the status quo because the FPRs permit *all* dead, dying, or damaged trees to be salvaged immediately.[36]  AR 19090.  CM 3 therefore provides a clear conservation benefit.

## C. The BiOp Appropriately Analyzes How the CMs Address Threats to SO

EPIC next alleges the BiOp's reliance on CMs 1, 2, and 3 is arbitrary and capricious because those CMs fail to address the primary threats to SO.  ECF No. 38 at 33:22-24.  EPIC again ignores over half of the HCP's CMs (CMs 4 through 8).  But a jeopardy determination must consider "all effects of the proposed action," including all CMs.  *Ctr. for Biological Diversity v. U.S. Bureau of Land Mgmt.*, 698 F.3d 1101, 1113 (9th Cir. 2012); *see* AR 22959 (BiOp relying on CMs 1-8 for no jeopardy finding).  In addition, EPIC's attempt to re-frame its criticisms of CMs 1-3 in the context of the BiOp, *see* ECF No. 38. at 33:22-28, 34:1-2, fails for the same reasons discussed above in Section B.  Where a BiOp relies on mitigation measures, those measures "must address the threats to the species in a way that satisfies the jeopardy and adverse modification standards."  *Ctr. for Biological Diversity v. Bernhardt*, 982 F.3d 723, 743 (9th Cir. 2020) (citation omitted).  Consistent with this requirement, the CMs comprehensively address the greatest threats to SO.

The BiOp canvasses relevant literature to identify threats to the CSO, which include not only the current threats—habitat loss from wildfire and BO (standing at the gates of the CSO's

---

[34] As Appendix 5.4 explains, rigorous pre-salvage surveys are required within 0.5 miles of all known ACs (the "provincial median annual home range[,]" AR 20246), and for areas outside 0.5 miles of known ACs with intermediate-to-moderate burn severity (where suitable SO habitat could remain).  AR 20226-27.

[35] CM 3's retention standards are the same as those in SPI's Fisher Candidate Conservation Agreement with Assurances (CCAA), which is set to expire in November 2026.  AR 19091.  CM 3 therefore locks these retention standards in for the full 50-year permit term.

[36] Salvage is the removal of "only those trees which are dead, dying, or deteriorating, because of damage from fire, wind, insects, disease, flood, or other injurious agent."  AR 16230; *see* 14 CCR §§ 912.7, 932.7; Nest trees, designated perch trees, screening trees, and replacement trees must be retained for active nest sites. 14 CCR §§ 939.2, 959.2; AR 16289; Cal. Fish & Game Code § 3503.5.

range)—but also climate change and rodenticides used in illegal marijuana cultivation. AR 22942; *see also* 41300, 41337-38, 41344-45 (2019 CSO status assessment); 31976, 31979, 32191-95, 32195-99, 32201 (Gutiérrez et al. 2017). The NSO, of course, faces the same stressors. AR 22982-87, 22989-93. The HCP addresses all of these threats and more. *See*, *supra*, pp. 10-16. CM 1, CM 2, CM 3, CM 5, and CM 7 provide important protections for current and future habitat. *See* AR 19087-88, 19090, 19094-108 (HCP); AR 22943, 22947-54 (BiOp). Meanwhile, CM 4 reduces catastrophic wildfire risk. AR 19091-94 (HCP); AR 22950, 22953 (BiOp). CM 6 addresses rodenticides. AR 19096-97 (HCP); AR 22945, 22954 (BiOp). CM 8 responds to the BO invasion. AR 19109-10 (HCP); AR 22950, 22953 (BiOp).

The HCP's Changed Circumstances, AR 19158, and Adaptive Management, AR 19152-56, sections, discussed below, ensure the CMs continue to address these threats despite uncertainty about future conditions, including those caused or exacerbated by climate change, such as wildfire, warmer temperatures, lack of rainfall, and drought.[37] AR 19158. But EPIC does not acknowledge any of these benefits.[38]

In sum: the HCP's CMs are data-based measures that respond to what the scientific literature identifies as the primary threats to the SO. The Service's "no jeopardy" determination was grounded in rigorous science, well-reasoned, and based on eight CMs that address the threats to the species in a manner that satisfies the jeopardy standard. *See Ctr. for Biological Diversity v. Bernhardt*, 982 F.3d 723, 743 (9th Cir. 2020).

**D.    The BiOp Properly Evaluates Climate Change in Its Jeopardy Analysis**

EPIC contends that the BiOp is arbitrary and capricious because "the body of the BiOp" fails to grapple with the effects of climate change. ECF No. 38 at 34:27-28. But yet again, EPIC

---

[37] EPIC seeks to analogize this BiOp to the one found deficient in *W. Watersheds Project v. McKay*, No. 22-35706, 2023 WL 7042541, at *3 (9th Cir. Oct. 26, 2023), but the comparison is misplaced. *See* ECF No. 38 at 34:3-7. In that case, the BiOp relied on mitigation that failed to address harms that would occur before harmful conditions are identified and mitigation measures implemented. *Id.* at *3. This BiOp, however, relies on regular data collection, mandatory and robust monitoring, Adaptive Management, and Changed Circumstances provisions ensuring the Service and SPI identify and promptly respond to changing conditions. AR 22959-60 (BiOp), AR 19148-54 (HCP).
[38] For instance, EPIC incorrectly claims that the HCP will "accelerate" habitat loss, ECF No. 38 at 34:11-12, when the HCP will nearly double PHAs over the permit term. AR 19087.

ignores information that belies its position, including Appendix A (August 2020 status review for the NSO) to the BiOp. Nor can EPIC cite any authority for its novel proposition that a BiOp must address topics in its "body" even when those topics are adequately addressed by other materials incorporated in the BiOp by reference. Here, the BiOp includes Appendix A, and Appendix A contains a section specifically about identifying and evaluating the effects of climate change. AR 22989-92. The BiOp also incorporates and attaches the HCP, AR 22931, which includes a discussion of climate change and how its effects will be addressed. AR 19158. The FEIS contains additional details, too. AR 21830-31. Against that backdrop, EPIC fails to show error.

### 1. The BiOp's Discussion of Climate Change Threats to SO Is Adequate

EPIC asserts at the outset that the BiOp "uses the word 'climate' only once." ECF No. 38 at 34:27-28. But a simple text search shows the BiOp references "climate change" 40 times. AR 22925-23047. Indeed, Appendix A, which is attached to the BiOp, routinely references "climate change" and includes a separate section on climate change's potential impacts to SO and its habitat. AR 22989-92. That section considers the scientific literature and concludes that while the effects of climate change may vary they are "likely to exacerbate some existing threats to the spotted owl such as the projected potential for increased habitat loss from drought-related fire, tree mortality, insects and disease, as well as affecting reproduction and survival during years of extreme weather."[39] AR 22992.[40]

Moreover, even apart from Appendix A, the BiOp builds upon the significant climate change analysis provided in the HCP and FEIS, incorporating both by reference.[41] The FEIS calls

---

[39] For example, Karl et al (2008), Dale et al. (2001), and Yospin et al. (2015) indicate that "[e]ffects of climate change, including fire and pest incidence, will not only affect currently suitable habitat . . . they will also likely alter or interrupt forest growth and development processes . . . that influence forest turnover rates and the emergence of suitable habitat attributes in new locations." AR 22990.
[40] Oddly, EPIC later acknowledges Appendix A, but only to fault it for not expressly discussing CSO. ECF No. 38 at 36:15-16. This is a distinction without a difference because the two subspecies are genetically similar, face the same threats, and have similar habitat preferences and uses. *See, e.g.,* 68 Fed. Reg. 7580 (Feb. 14, 2003); AR 26603, 21739-40  By addressing threats to NSO, the BiOp necessarily addresses threats to CSO as well. And in any event, the BiOp explicitly mentions climate change as a threat to both CSO, AR 22942-43, and NSO, AR 22989-93.
[41] The FEIS was relied upon by the Service in its preparation of the BiOp. AR 22930-32, 22952. The BiOp likewise incorporates the HCP. AR 22931.

SPI'S MPA ISO MOTION FOR SUMMARY JUDGMENT

Case No. 2:23-cv-02611-TLN-CSK

out climate change as a primary threat to the CSO subspecies, AR 21815, and directly rebuts EPIC's contention that the Service's climate change analysis failed to consider "unique threats," including wildfire, to CSO habitat in the Sierra Nevada.  ECF No. 38 at 36:15-37:2.  The FEIS explains that "[s]pecifically, for the CSO, climate change is predicted to have significant effects on the forests of the Sierra Nevada (as cited in Gutiérrez et al. 2017)."  AR 21831.  "Shifts in the distribution of CSO populations may occur as the Sierra Nevada's vegetation distribution is altered, with low- and mid-elevation forests likely being converted to woodlands, shrublands, and grasslands, especially with increased fire risk[.]"  *Id.*  The HCP likewise acknowledges the "effects of drought and climate change on vegetation" as primary threats to CSO, citing Gutiérrez et al. 2017.  AR 19059.

### 2.    The BiOp's Discussion of the Effects of Climate Change on the HCP and Its CMs Is Adequate

The BiOp references and relies upon the HCP's Changed Circumstances and Adaptive Management sections.  *See, e.g.,* AR 22956, 22959.  The HCP's design demonstrates the Service's awareness that climate change will produce uncertain impacts to which the Service and SPI must be able to respond promptly and flexibly throughout the 50-year permit term.

The HCP's Changed Circumstances section identifies "effects due to climate change" as changed circumstances for which the Service and SPI can anticipate, plan, and implement additional conservation and mitigation measures.  AR 19157.  It discusses climate change as a "potential driver of increased wildfire intensity and size, fire season length . . . [and] drought or storm intensity[,]" which may affect both habitat availability and prey.  AR 19158.  And it notes that changes in climate are further "expressed in other changed circumstances[,]" such as more frequent and more severe wildfires and insect outbreaks that cause a statistically significant decline in occupancy parameters and/or push owls to not use even-aged habitat.[42]  AR 19158-62.

The HCP provides a roadmap to address these potential impacts of climate change.  For example, if a catastrophic wildfire or disease outbreak creates more than 25,000 contiguous acres of "Substantially Damaged Timberland," or if multiple fires or disease outbreaks cumulatively

---

[42] Moreover, to the extent that climate change manifests through increased wildfire severity, CM 4 directly mitigates the risk of catastrophic wildfire, which could destroy SO habitat and frustrate the conservation goals of the HCP, with even-aged management and fuel breaks.  AR 19091-94.

SPI'S MPA ISO MOTION FOR SUMMARY JUDGMENT

Case No. 2:23-cv-02611-TLN-CSK

1 create more than 100,000 acres of Substantially Damaged Timberlands (less than 6.5% of the Plan

2 Area), SPI and the Service must meet and confer to discuss additional actions SPI will implement.

3 AR 19159; *see also* AR 19017 (defining Substantially Damaged Timberlands). These actions may

4 include requiring SPI to move most of its green tree (i.e., live tree) harvest operations to the

5 damaged areas as soon as possible and expedite reforestation activities there, modify fire

6 management activities to prevent additional fire risks, and/or modify MOU activities to further

7 coordinate fire management with other landowners.[43] AR 19159.

8         The HCP's Adaptive Management section also accounts for climate change impacts on the

9 CMs and sets out thresholds for Compliance and Effectiveness Monitoring that, if triggered, require

10 the Service and SPI to discuss necessary changes to HCP implementation. AR 19148-54. Thus,

11 the BiOp, by incorporating the HCP's Changed Circumstances and Adaptive Management sections,

12 adequately addresses how the HCP and its CMs should adapt to the effects of climate change.

13        **E.**     **The Service's Take Calculation Methodology Is Lawful**

14         EPIC also takes issue with the Service's choice of methodology to determine take, asserting

15 that the hexagon tool is unlawful and that surveys to determine take are too uncertain. ECF No. 38

16 at 38-40. These contentions also lack merit.

17        **1.**     **The Hexagon Tool Is a Proper Method To Determine Incidental Take**

18         EPIC claims the HCP's take calculation methodology is arbitrary and capricious because

19 once take occurs, further entries into that same hexagon can never be counted as additional take.

20 ECF No. 38 at 39:1-8. Not so. Although subsequent entries are not automatically considered take

21 under the HCP's methodology, the BiOp and HCP are clear that the Service must review the

22 impacts of subsequent entries to determine whether additional take has occurred. AR 22958; *see*

23 *also* AR 19119. As explained in the BiOp, if the Service determines "through annual reports or

24 other information that operations within a given hexagon over consecutive years have resulted in

25 impacts to an occupied [Activity Center], the Service and SPI will work together to determine if

26 ―――――――――――――

27 [43] Similarly, if ACs are destroyed by wildfire or disease outbreak "to the extent that prevents meeting the statistical goal of the occupancy study," this is also a changed circumstance. AR 19159.

28 Within 6 months, SPI will modify the study methodology or relocate or redesign the study area to include additional ACs, and it must meet and confer with the Service on modifications. *Id.*

    

1    actual take has occurred more than once during that time period." AR 22958. This is no different

2    than the Service's mandate to consider any entry a take if it causes a decrease in an occupied

3    hexagon's habitat threshold, regardless of what was previously modeled. *Id.*

4        EPIC then compounds its error by claiming that, because the ITP ignores the potential for

5    multiple instances of take, the hexagon tool negates the ITP's trigger function (for when authorized

6    take has been exceeded) and does not enable the Service to halt logging and reinitiate consultation.

7    ECF No. 38 at 39:17-40:1. Again, the Service accounted for the possibility of consecutive take.

8    AR 22958. This provides a mechanism for the Service to halt logging and reinitiate consultation:

9    "In instances where the amount or extent of incidental take is exceeded, any activities causing such

10   take must cease, pending reinitiation" of consultation. AR 22960. Further, the ITP explicitly limits

11   take via habitat modification over the permit period on both annual and decadal bases. AR 22958-

12   59; 19125. EPIC's attempt to analogize this robust process to the deficient ITS in *Oregon Natural*

13   *Resources v. Allen*, 476 F.3d 1031 (9th Cir. 2007) is entirely without merit. Unlike in *Allen*, the

14   BiOp here "permit[s] the [Service] to halt the project and reinitiate consultation" because "the

15   permissible level of take" is not "coextensive with the project's own scope." *Id.* at 1038-39

16   (faulting BiOp for omitting a "trigger" to reinitiate consultation because the "all spotted owls" limit

17   would not be reached until the project was complete).

18                    **2.    The HCP's State-of-the-Art Survey Protocols Are Highly Accurate**

19       Although SPI surveys have a greater than 97% detection rate, AR 19095, EPIC contends

20   that the Service's approach for determining incidental take falls short of the best available science

21   for determining SO occupancy because BO suppress SO survey responses, resulting in uncounted

22   take of SO. ECF No. 38 at 40:15-20. But the take calculation is already conservative, and projected

23   take is, in any event, likely overestimated. AR 19119-20. Further, EPIC offers no alternative to

24   the HCP's robust survey measures, suggesting instead that once an AC has been identified (through

25   surveys), no amount of subsequent surveys are ever sufficient to determine the AC is no longer

26   occupied. That position finds no support in the record, or common sense.

27       And again, EPIC ignores the several ways in which the HCP addresses BO. First, the HCP's

28   survey protocols establish certain precautions and steps that must be followed to ensure surveys are

1   accurate despite the known or suspected presence of BO.  AR 20210-14, 20245.  Second, those

2   same protocols require at least six visits across multiple weeks if BO are present, which reduces

3   the risk that a transient BO may affect the results.  AR 20212-14.  Last, CM 8—a "keystone" of the

4   HCP according to EPIC's prior comments, AR 23389—requires SPI to scour its lands to identify

5   and remove BO.  AR 19181.  Thus, any potential interference with already-accurate surveys is

6   further reduced by the BO removal provided by the HCP.  *See Ariz. Cattle Growers' Ass'n*, 606

7   F.3d at 1164 (noting the ESA requires use of the best scientific data available, but not "absolute

8   confidence[,]" and it "accepts agency decisions in the face of uncertainty.").  EPIC falls far short

9   of showing any error associated with the HCP's survey protocols and their use in calculating take.

10          **F.      The EIS Properly Defined and Evaluated the No Action Alternative**

11          When the Service prepared the EIS, it included and evaluated the effects of a "no action

12   alternative," i.e., not taking the proposed action or another alternative action.  43 C.F.R. § 46.30

13   ("no action alternative looks at effects of not approving the action under consideration.").  The no

14   action alternative is the "baseline" against which other alternatives are considered.  *Ctr. for Bio.*

15   *Diversity v. U.S. Dept. of Int.*, 623 F.3d 633, 642 (9th Cir. 2010).  The no action alternative

16   evaluated in the EIS provided "a way to legally harvest timber without issuance of an ITP . . . (i.e.

17   this alternative avoids incidental 'take' of listed species)."  AR 21701.  In other words, this

18   alternative projected that SPI would continue logging in compliance with state and federal law just

19   as it had done for the better part of a century before the HCP's approval and the ITP's issuance.

20   The Service found that issuing the ITP would have "[b]eneficial effects compared to the No Action

21   Alternative because of the implementation of the [HCP's] conservation measures."  AR 21714.

22          EPIC's main arguments against the no action alternative boil down to complaints that the

23   Service did not consider what would happen if SPI did not log *any* of its land for the next 50 years.

24   *See* ECF No. 38 at 42:9-15; 44:10-14.  That is plainly unrealistic.  SPI has lawfully harvested its

25   timberlands for years, including potential NSO habitat, and would continue to do so in the absence

26   of the HCP and ITP.  However, under the HCP's CMs, SPI will implement limitations on harvesting

27   that will result in the growth of more and better SO habitat over time.

28          EPIC fares no better in its attempt to find inconsistency in the Service's findings that

1   existing laws would (i) successfully prevent incidental take but (ii) not sufficiently address overall
2   threats to SO.  ECF No. 38 at 42:21-43:10.  Those findings merely acknowledge the possibility that
3   the species' primary threats (wildfire and BO) could lead to the species' extirpation regardless of
4   human-caused take.  If anything, EPIC's argument highlights the importance of the HCP and the
5   CMs that address those primary threats.  EPIC's claim that the EIS improperly excludes pre-HCP
6   CMs from the no action alternative likewise fails.  ECF No. 38 at 43:11-12.  These precursor CMs
7   were implemented to gather data and provide a foundation for the HCP, and they would be
8   discontinued if the HCP was not implemented.  AR 23086.  The Service took this into consideration
9   to find SPI would cease those CMs and return to its prior no-take avoidance regime in the absence
10  of the HCP, which is exactly what EPIC's own authorities require.  ECF No. 38 at 41:13-16, 43:17-
11  20.[44]  Last, EPIC's remaining arguments, ECF No. 38 at 44:1-45:4, all assume that its prior
12  arguments are correct, which they are not, and so fail for the same reasons set forth above.[45]

13                                    **CONCLUSION**

14          We respectfully ask that the Court grant this motion for summary judgment and deny
15  EPIC's motion for summary judgment.

16          Respectfully submitted,

17  DATED:  April 16, 2025                          PAUL HASTINGS LLP
18
19                                                  By:   /s/ Christopher Carr
20                                                        CHRISTOPHER J. CARR
21                                                  Attorneys for Defendant-Intervenor
                                                    SIERRA PACIFIC INDUSTRIES
22

23  [44] EPIC cites 46 Fed. Reg. 18026 at 18027 (Mar. 23, 1981) for the proposition that "if the agency's
24  "no action" choice would result in predictable actions by others, this consequence . . . should be
    included in the analysis."  Of course, SPI would have no reason to continue precursor activities
25  necessary to prepare the HCP if the HCP were ultimately disapproved.
    [45] EPIC concludes by asking this Court to vacate the BiOp, RoD, ITP, and HCP.  ECF No. 38 at
26  45:5.  Aside from failing to show any error, EPIC ignores that vacatur is inappropriate where, as
    here, it would lead to "environmental disruption."  *N. Plains Res. Council v. U.S. Army Corps of*
27  *Eng'rs,* 460 F.Supp.3d 1030, 1038 (D. Mo. 2020).  Reports show the HCP is working and setting
    these approvals aside would result in the immediate loss of significant benefits.  *See* Murphy Decl.,
28  Ex. B at 29-30 (finding implementation of CM 8 resulted in the birth of over 70 additional SO).